2014 MAY 12 Pt 9:10
COURT OF APPEALS DIV I

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 69743-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| VADIM FEDOROV, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: May 12, 2014 |

LAU, J. — Vadim Fedorov appeals from the judgment and sentence entered after a Snohomish County jury found him guilty of second degree identity theft. Because (1) the passage of time and change of circumstances did not render the Miranda[1] warnings stale, (2) the evidence sufficiently established that Fedorov used the name of a specific, real person with intent to commit a crime, (3) the court was not required to instruct the jury as to the specific crime Fedorov intended to commit, and (4) the court's reasonable doubt instruction properly stated the law, we affirm.

## FACTS

On October 7, 2012, Everett Police Officer Christopher Reid stopped Fedorov for speeding. Fedorov had no driver's license. Officer Reid asked him for his name and

---

[1] Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

date of birth. He identified himself as Zachary Anderson with an August 31, 1984 birth date. A computer search showed multiple arrest warrants for an individual named Zachary Anderson, born on August 30, 1984. Officer Reid decided the match was sufficiently close and arrested Fedorov on the warrants. Officer Shane Nelson read Fedorov his Miranda rights in Officer Reid's presence. Fedorov said he understood those rights and was willing to talk to the officers.

Still not convinced that Fedorov was who he claimed to be, officers took his fingerprints and compared them to the known prints for Zachary Anderson.[2] Officers determined Fedorov's true name was Vadim Fedorov. At trial, Sergeant George Hughes testified that he contacted Fedorov in the booking area after learning about the fingerprint results:

> Q. . . . You took that information. You went out to that area?
> A. Yes. And I walked up by one of the deputy stations and I called for, I think it was a Zachary and then an Anderson. And then finally I called for Fedorov, and Mr. Fedorov raised his hand.
> I motioned him to come up to me, and he came up. And I said, "You know, it really pisses me off. You waste our time like this. Why didn't you just tell me who you were?" I said, "Do you think we're stupid?" And he says, "Yeah." I said, "Go sit down."
> Q. Okay. And when you called out the name for Zachary Anderson, did the defendant have any kind of, did he display any kind of physical—anything?
> A. He was just looking around the room. Yeah.
> Q. Any other statements the defendant made at that point?
> A. I didn't talk to him any further.

Report of Proceedings (RP) (Dec. 18, 2012) at 137-38.

The State charged Fedorov with second degree identity theft, alleging he used the identity of Zachary Anderson, born on August 30, 1984, to mislead a public servant. A jury found Fedorov guilty as charged. Fedorov appeals.

---

[2] Fingerprint comparison is not part of the general booking process.

## ANALYSIS

### Voluntariness of Statements

Fedorov first contends the trial court erroneously denied his CrR 3.5 motion to suppress the above-quoted statements he made at the jail to Sergeant Hughes, who questioned Fedorov about his identity. He argues the passage of time and changed circumstances rendered the Miranda warnings "stale." Br. of Appellant at 2. According to Fedorov, fresh Miranda warnings were required before Sergeant Hughes questioned him. The parties agree the questioning constituted custodial interrogation for Miranda purposes. The issue here is whether Sergeant Hughes's failure to issue fresh Miranda warnings before questioning Fedorov rendered Fedorov's responses involuntary and, thus, inadmissible.

The United States Supreme Court "has eschewed per se rules mandating that a suspect be re-advised of his rights in certain fixed situations in favor of a more flexible approach focusing on the totality of the circumstances." United States v. Rodriguez-Preciado, 399 F.3d 1118, 1128 (9th Cir. 2005). Generally, "[w]here a defendant has been adequately and effectively warned of his constitutional rights, it is unnecessary to give repeated recitations of such warnings prior to the taking of each separate in-custody statement." State v. Duhaime, 29 Wn. App. 842, 852, 631 P.2d 964 (1981) (fresh warnings held unnecessary where the defendant signed a written waiver of constitutional rights less than two hours before the challenged questioning occurred).

Fedorov argues fresh warnings were necessary partly because three and a half [3] hours passed between the initial advice of rights and the challenged questioning. But courts have upheld confessions in the face of far lengthier delays. See 2 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 6.8(b) at 805 (3d ed. 2007) (collecting cases supporting proposition that fresh warnings are generally unnecessary "after the passage of just a few hours"). In Rodriguez-Preciado, for example, the court held fresh warnings were unnecessary even though the police resumed questioning 16 hours after advising the defendant of his rights. Rodriguez-Preciado, 399 F.3d at 1129. And in United States ex rel. Henne v. Fike, 563 F.2d 809 (7th Cir. 1977), cited by the State, the court held fresh warnings were unnecessary despite a nine hour interval. Fike, 563 F.2d at 814. The interval here—three and a half hours—was brief by comparison.

Fedorov also contends fresh warnings were necessary due to the "change in personnel." Br. of Appellant at 11. He relies on Zappulla v. New York, 391 F.3d 462 (2d Cir. 2004), but that case is distinguishable. In Zappulla, the court concluded the defendant's confession violated due process where

> (1) 24-hours had lapsed between the giving of Miranda warnings and the questioning of Zappulla about [the victim's] murder; (2) Zappulla was not in continuous police custody between the initial giving of Miranda warnings and the subsequent interrogation; and (3) the second interrogation concerned a crime unrelated to that for which he was initially arrested.

Zappulla, 391 F.3d at 474. Here, the "lapse" was relatively short, and Fedorov remained in police custody after the issuance of Miranda warnings. Finally, although Sergeant Hughes questioned Fedorov about a crime arguably unrelated to the arrest

---

[3] Both parties agree the time lapse between Miranda warnings and the contested statements to Sergeant Hughes was three to three and a half hours.

warrants, significantly, both Officer Reid and Sergeant Hughes asked questions for the same purpose—to determine Fedorov's true identity. The mere lapse of time and change of interrogator does not render Miranda warnings "stale" necessitating repetition of rights before a voluntary statement may be made. Wyrick v. Fields, 459 U.S. 42, 48-49, 103 S. Ct. 394, 74 L. Ed. 2d 214 (1982); United States v. Andaverde, 64 F.3d 1305, 1312 (9th Cir. 1995).

Fedorov also argues that "the securing of the fingerprint comparisons" constituted a change in circumstances necessitating fresh warnings. Br. of Appellant at 11. On this point, he cites no authority. Argument unsupported by citation to authority need not be considered. RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). In any event, the police may actively deceive a suspect without destroying the voluntariness of a confession. See State v. Burkins, 94 Wn. App. 677, 695, 973 P.2d 15 (1999) ("Deception alone does not make a statement inadmissible as a matter of law; rather, the inquiry is whether the deception made the waiver of constitutional rights involuntary."); see also Commonwealth v. Martinez, 458 Mass. 684, 693, 940 N.E.2d 422 (2011) ("If the making of false or incriminating statements and being confronted by them were to undermine and render ineffective an otherwise valid Miranda waiver, police would be obliged to repeat Miranda warnings whenever a defendant in an interrogation moves toward inculpating himself. This is not the law."). Considering the totality of the circumstances discussed above, we conclude "the securing of the fingerprint comparisons" was not an intervening circumstance necessitating fresh warnings.

We conclude the trial court properly admitted Fedorov's challenged statements.

Sufficiency of the Evidence

Fedorov next challenges the sufficiency of the evidence supporting his second degree identity theft conviction. He contends the State failed to prove (1) that he used the identity of a "specific real person or corporation" and (2) that he used the identity "with the intent to effectuate any specific crime." Br. of Appellant at 14-15.

"A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences to be made from it." State v. O'Neal, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). We will reverse a conviction "only where no rational trier of fact could find that all elements of the crime were proved beyond a reasonable doubt." State v. Smith, 155 Wn.2d 496, 501, 120 P.3d 559 (2005). An identity theft conviction requires proof that the defendant knowingly obtained, possessed, used, or transferred a means of identification or financial information of another person, living or dead, with the intent to commit, or to aid or abet, any crime.[4] RCW 9.35.020(1). The victim must be a "specific, real person." State v. Berry, 129 Wn. App. 59, 67, 117 P.3d 1162 (2005).

Fedorov first argues, "The State failed to prove that Mr. Fedorov misused the identity of a person in light of his dogged insistence on a date of birth that did not match any of the more than 26 individuals with similar names found just within the Judicial Information System (JIS)." Br. of Appellant at 14. We are not persuaded.

---

[4] First degree identity theft requires proof that the defendant obtained "credit, money, goods, services, or anything else of value in excess of one thousand five hundred dollars in value . . . ." RCW 9.35.020(2). Second degree identity theft requires a violation not amounting to first degree identity theft. RCW 9.35.020(3).

It is undisputed that Zachary Anderson, born on August 30, 1984, is a "specific, real person."[5] Berry, 129 Wn. App. at 67. Fedorov acknowledges he used the name "Zachary Anderson" but claims that the August 31, 1984 birth date he used belonged to none of the Zachary Andersons of record.

Fedorov's argument ignores Officer Reid's testimony. According to Officer Reid, Fedorov initially insisted his birth date was August 31, 1984. He later used the actual date of Zachary Anderson's birth date—August 30, 1984:

> Q. So you asked him for his birth date and he gave the birthday of 8/31/84; correct?
> A. Yes, sir.
> Q. And Dispatch came back to a Zachary Anderson 8/30/84?
> A. Yes, sir.
> . . . .
> Q. At any point while at the jail or on the traffic stop did the defendant ever admit that his birthday was 8/30/84?
> A. At the jail, Mr. Fedorov finally admitted that he was born on the 30th.

RP (Dec. 18, 2012) at 109-12. Assuming the truth of this evidence, a rational trier of fact could find beyond a reasonable doubt that Fedorov used the name and birth date of a specific, real person—Zachary Anderson, born on August 30, 1984.

Fedorov also challenges the sufficiency of the evidence establishing that he used Zachary Anderson's identity "with the intent to commit, or to aid or abet, any crime." RCW 9.35.020(1). Under Washington law, "[a] person who knowingly makes a false or misleading material statement to a public servant is guilty of a gross misdemeanor." RCW 9A.76.175. Here, assuming the truth of the State's evidence, we conclude that a

---

[5] The court admitted Anderson's state identification card, which confirmed his name and August 30, 1984 birth date.

rational trier of fact could infer that Fedorov acted with intent to commit the crime of knowingly making a false or misleading material statement to a public servant.

The record shows Fedorov repeatedly told Officer Reid his name was Zachary Anderson. These statements caused Officer Reid to arrest Fedorov on Anderson's outstanding warrants. At the jail, Fedorov also claimed Anderson's birth date. Officer Reid informed a booking officer that "some of the details were off and that [Fedorov] may have been lying about his name." RP (Dec. 18, 2012) at 111. Given the uncertainty of Fedorov's identity, jail staff performed a fingerprint analysis. A corrections deputy testified that because fingerprinting was not part of the standard booking process, it took "extra time" to book Fedorov into jail. RP (Dec. 18, 2012) at 135. At no point during the analysis did Fedorov reveal his true identity.

Sergeant Hughes confronted Fedorov after the fingerprinting analysis indicated his true name was Vadim Fedorov. Fedorov raised his hand when Sergeant Hughes called out "Fedorov" in the jail's booking area. When Sergeant Hughes asked if Fedorov thought the jail staff was "stupid," Fedorov responded, "Yeah." RP (Dec. 18, 2012) at 137. Fedorov planned to reveal his true identity during his booking interview. A booking officer testified, "He told one of our officers that he was going to admit to his identity after—during his interview process." RP (Dec. 18, 2012) at 130.

Given Fedorov's multiple acts of intentional deception, a rational trier of fact could infer that he intended to violate the false statement statute, RCW 9A.76.175.

To-Convict Instruction

Fedorov next challenges instruction 8, the WPIC[6] to-convict instruction directing the jury to consider whether Fedorov used another person's identity "with the intent to commit or aid or abet any crime." (Emphasis added.) Fedorov argues the instruction must specify the crime he allegedly intended to commit—in this case, a violation of the false statement statute. The parties agree that the sole issue is whether the particular crime intended by a defendant charged with second degree identity theft is an essential element that must appear in the trial court's to-convict instruction. We review this issue de novo. State v. Mills, 154 Wn.2d 1, 7, 109 P.3d 415 (2005) (adequacy of to-convict instructions reviewed de novo).

Washington courts have addressed similar issues in a line of cases beginning with State v. Bergeron, 105 Wn.2d 1, 711 P.2d 1000 (1985). In Bergeron, the appellant argued that "the particular crime which the defendant intended to commit inside the building or dwelling is an element of the crime of burglary, and that such crime must be specifically charged, instructed on (in a jury trial) and found as a fact (in a trial to the court)." Bergeron, 105 Wn.2d at 6. The court disagreed, reasoning that burglary in Washington is modernly a statutory offense and that our burglary statutes plainly "require only an intent to commit any crime." Bergeron, 105 Wn.2d at 15. It concluded:

> [W]e now hold that the specific crime or crimes intended to be committed inside burglarized premises is not an element of burglary that must be included in the information, jury instructions or in the trial court's findings and conclusions. It is sufficient if the jury is instructed (or that the court find and conclude, as it did in the present case) in the language of the burglary statutes.

---

[6] 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 131.06, at 560 (3d ed. 2008).

Bergeron, 105 Wn.2d at 16. In so holding, the court expressly overruled State v. Johnson, 100 Wn.2d 607, 674 P.2d 145 (1983), to the extent that Johnson held the charging document and jury instructions must specify the defendant's intended crime "as an element of the offense." Bergeron, 105 Wn.2d at 8.

The Supreme Court subsequently applied Bergeron in the context of aggravated first degree murder. In State v. Jeffries, 105 Wn.2d 398, 717 P.2d 722 (1986), the trial court instructed the jury that a conviction required a finding that "the defendant committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime." Jeffries, 105 Wn.2d at 419. On appeal, the defendant challenged the instruction on the basis that it omitted the particular crime he allegedly concealed. Relying on Bergeron, the court held, "The specific crime need not be stated, as the statute did not require it." Jeffries, 105 Wn.2d at 420.

Bergeron's rationale applies with equal force here. Like burglary (and aggravated first degree murder), identity theft is a statutory offense. The statute merely requires proof of intent to commit "any crime." RCW 9.35.020(1). Under Bergeron, the statute is plain on its face and thus does not support "reading the element of intent to commit a particular crime into the statutory offense . . . ." Bergeron, 105 Wn.2d at 15.

Fedorov relies on State v. Bryant, 65 Wn. App. 428, 438, 828 P.2d 1121 (1992). In Bryant, the defendant argued "the information charging him with second degree felony murder was constitutionally defective for failing to specify the prong of the statute on which the underlying charge of first degree assault was based." Bryant, 65 Wn. App. at 437. In rejecting the defendant's argument, we noted that "the underlying crime is an element of felony murder . . . ." Bryant, 65 Wn. App. at 438.

-10-

Bryant is not controlling because it contained no discussion of jury instructions. The issue before us was the adequacy of the charging document, not the adequacy of the to-convict instruction. Despite Fedorov's suggestion, those issues are analytically distinct. See State v. Saunders, 177 Wn. App. 259, 269, 311 P.3d 601 (2013) (discussing "the different underlying purposes for including an essential element in a charging document and including such an element in a to-convict instruction.").

Further, cases discussing the elements of felony murder are of questionable relevance due to the felony murder statutes' unique language. Whereas the identity theft statute broadly requires intent to commit any crime, the second degree felony murder statute more narrowly requires commission or an attempt to commit "any felony, including assault, other than those enumerated in RCW 9A.32.030(1)(c)." RCW 9A.32.050(1)(b).[7] Commission of a felony listed in RCW 9A.32.030(1)(c) may elevate the offense to first degree felony murder. In contrast, the identity theft statute refers to "any crime" without qualification. According to Bergeron, this textual consideration is legally significant. We are unpersuaded by Fedorov's analogy to Bryant.

Fedorov also cites State v. DeRyke, 149 Wn.2d 906, 73 P.3d 1000 (2003). In DeRyke, the court held "it was error to give the jury a 'to convict' instruction for the charge of attempted first degree rape which did not specify the degree of the rape

_____

[7] At the time we decided Bryant, the statute required proof that the defendant committed or attempted to commit "any felony other than those enumerated in RCW 9A.32.030(1)(c) . . . ." Laws of 1975-76, 2d Ex. Sess., ch. 38, § 4. Fedorov asserts, "A person is guilty of murder in the second degree when he commits or attempts to commit any felony, and, in the course of and in furtherance of such crime or in immediate flight therefrom, he causes the death of another." Br. of Appellant at 18. His statement of the law is incomplete.

allegedly committed." DeRyke, 149 Wn.2d at 912. Fedorov does not argue that instruction 8 contained a similar deficiency. Instead, he relies on DeRyke for the unremarkable proposition that "the 'to convict' instruction must generally contain all elements of the charged crime." Br. of Appellant at 17. As discussed above, instruction 8 contained all essential elements of the charged crime.

As Fedorov acknowledges, the issue is ultimately one of due process. A to-convict instruction may violate due process if it leaves the jury guessing at the meaning of an element of the crime or relieves the State of the burden of proving an element. Saunders, 177 Wn. App. at 270. Fedorov does not claim the jury was left guessing as to which crime he intended to commit. His attorney conceded during closing arguments that her client was "guilty of making a false statement to a police officer . . . ." RP (Dec. 18, 2012) at 166. Finally, under Bergeron, Fedorov's claim that the to-convict instruction omitted an essential element is contrary to the identity theft statute's plain language. The to-convict instruction properly states the law.[8]

Reasonable Doubt Instruction

Fedorov lastly challenges the court's reasonable doubt instruction. He claims it was error to instruct the jury that "[i]f, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt."[9] Fedorov

_____

[8] Fedorov argues, "The error in failing to include the underlying offenses in the 'to convict' instruction was not a harmless error." Br. of Appellant at 20. Given our analysis, we need not reach this issue.

[9] The trial court used 11A Washington Practice: Washington Pattern Jury Instructions: Criminal 4.01, at 85 (3d ed. 2008), which includes the "abiding belief" language.

argues, "The 'belief in the truth' language encourages the jury to undertake an impermissible search for the truth." Br. of Appellant at 22.

We disagree. State v. Bennett, 161 Wn.2d 303, 165 P.3d 1241 (2007), and State v. Pirtle, 127 Wn.2d 628, 904 P.2d 245 (1995), control. Fedorov relies on State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012), to challenge the "abiding belief" language. He claims this language is similar to the impermissible "speak the truth" remarks made by the State during closing. Emery, 174 Wn.2d at 751. Emery found the "speak the truth" argument improper because it misstated the jury's role. Here, read in context, the "belief in the truth" phrase accurately informs the jury its "job is to determine whether the State has proved the charged offenses beyond a reasonable doubt." Emery, 174 Wn.2d at 760. The reasonable doubt instruction accurately stated the law.

## CONCLUSION

For the reasons discussed above, we affirm Fedorov's conviction.

WE CONCUR:

-13-