**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71254-3-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| MAURICE HENRY POLLOCK, | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: July 20, 2015 |
| | ) | |

Cox, J. – Maurice Pollock appeals from his conviction for assault in the second degree while armed with a firearm, asserting insufficient evidence and instructional error. But viewed in the light most favorable to the State, the evidence was sufficient to establish the corpus delicti and to support Pollock's conviction. Our supreme court has approved the challenged reasonable doubt instruction. Pollock's statement of additional grounds raises no meritorious issues. We affirm.

On November 19, 2010, Nigel Greer lived with his fiancée Annaka Lain and their two young children in apartment 73 at the Sunset Vista Apartments in Renton. At about 10:00 a.m., Greer walked downstairs from his apartment to pick up his mail.

After walking back upstairs, Greer encountered Brandon Wolfe, who lived two doors away in apartment 75. Wolfe was a casual acquaintance who had

No. 71254-3-I/2

purchased marijuana from Greer on several occasions. According to Greer, prior conversations between the two involved nothing more than "what weed, what kind of weed I had or if he wanted to purchase some or whatever."[1]

As Greer walked by, Wolfe asked if Greer knew his friend "Moe." Wolfe indicated that "Moe" had been selling marijuana in the area for a long time and had "the spot sewed up."[2] Greer expressed a lack of interest in the message that Wolfe appeared to be conveying.

Upon returning to his apartment, Greer watched television while Lain slept in the bedroom with the couple's infant son. Suddenly, Greer heard a "loud bang" on the door and someone yelled "Police, open up."[3] Acknowledging that he was paranoid "because I have got some weed in my house,"[4] Greer looked through the peephole on the door, but could see nothing at first. At some point, Lain came out of the bedroom and stood near Greer.

After a short time, Greer was able to see through the peephole, but saw no one outside. When Greer opened the door, he saw Wolfe and a man he identified as Pollock nearby. Pollock was holding a handgun and ranting about a prior robbery incident in which he had been shot. Greer moved just outside the door to block Pollock's entry. In the meantime, Lain armed herself with one of

---

[1] Report of Proceedings (Sept. 11, 2013) at 31.
[2] Id. at 34.
[3] Id. at 38-39.
[4] Id. at 39.

-2-

her handguns. At some point Pollock pointed his handgun at Greer's head and said, "I hate fucking niggers."[5]

Greer put his hands up and stepped back into the apartment as "all hell broke loose."[6] Greer heard about 20 to 25 shots fired in rapid succession. Greer believed that Lain had hit Pollock, who quickly retreated, firing wildly. Wolfe had started firing as well.

Greer acknowledged that he had a 2009 conviction for witness tampering and was not allowed to possess a firearm. He denied that he had held or fired a gun or that he or Lain had pursued the assailants beyond the alcove just outside his apartment door. Greer recalled that Pollock had a handgun during the confrontation, but claimed he did not see Pollock carrying a shotgun or "anything . . . wrapped up."[7]

Lain testified that she was awakened by pounding on the apartment door. On her way to the living area, she placed her infant son on a sofa. Lain heard someone at the door yelling "Police. Search warrant. Open the door."[8]

When Greer opened the door, Lain saw a man carrying "like a rifle or something wrapped in his shirt."[9] The man was standing just inside of the

---

[5] Id. at 46.
[6] Id. at 47.
[7] Id. at 44.
[8] Id. at 86.
[9] Id. at 88.

apartment as Greer tried to calm him down and back him out. Lain later saw a second man standing behind the intruder.

Lain retrieved her .45 caliber handgun from a backpack and stood near Greer. The intruder became increasingly aggressive and eventually pulled out a handgun, held it to Greer's head, and uttered a racial slur. Thinking that the man was going to kill Greer, Lain opened fire, emptying her gun:

> All I remember was shooting. I just started pulling the trigger. I just – as fast as I could, and both of them started pulling their trigger as fast as they could.[10]

One of the bullets went through Lain's shorts, but she was otherwise uninjured. Lain then scrambled along the floor to grab her 9 mm handgun and resumed shooting. Lain and Greer eventually closed the apartment door and called 911.

Pollock and Wolfe gave different accounts of the confrontation.[11]

Wolfe testified that on the day before the confrontation, he was returning to his apartment when he encountered Greer. Greer, who had previously sold marijuana to Wolfe, seemed upset. As Wolfe walked by, Greer appeared to be "dry-firing"[12] a pistol in the pocket of his sweatshirt, which Wolfe believed was some kind of a warning.

---

[10] Id. at 111-12.
[11] Prior to trial, Wolfe pleaded guilty to two counts of second degree assault.
[12] Report of Proceedings (Sept. 17, 2013) at 78.

On the following morning, a neighbor asked Wolfe for some marijuana. Wolfe reluctantly sold him a "dime bag," but just as a one-time "favor."[13]

A short time later, Wolfe heard a loud "bang" at his door. Through the peephole, Wolfe saw Greer and another man standing outside. Both men looked intimidating, and Wolfe stepped outside to talk to them.

Greer informed Wolfe that he was not allowed to sell marijuana "on my tier."[14] Wolfe acknowledged his understanding and apologized profusely. Wolfe admitted, however, that he also told Greer, "I have a gun and I will defend myself."[15] Greer and the other man left and Wolfe went back inside. Wolfe then called Pollock, a close friend, to arrange for "something that I would be able to protect myself with."[16]

A short time later, Pollock arrived at Wolfe's apartment with an AK-47 assault rifle, a shotgun loaded with "beanbags,"[17] and two .357 revolvers. Pollock was wearing a bullet proof vest.[18] After bringing the weapons into the apartment, Pollock showed Wolfe how to use them.

Wolfe followed Pollock over to Greer's apartment, where Pollock knocked on the door and yelled "police." Both Pollock and Wolfe were armed with

---

[13] Id. at 79.
[14] Id. at 82.
[15] Id. at 112.
[16] Id. at 84.
[17] Id. at 15.
[18] Id. at 16.

Pollock's handguns. Pollock was also carrying the shotgun, wrapped in a blanket. Wolfe heard someone shouting inside, but no one opened the door. Pollock shouted "Leave my brother and his family alone"[19] through the door, and the two returned to Wolfe's apartment. In a statement to police, Wolfe said that he and Pollock had gone over to Greer's apartment to "intimidate" him.[20]

Wolfe insisted on taking his family to Pollock's house and made preparations to leave. As Wolfe followed Pollock out the door, he saw Greer, who was "yelling and cussing and stuff."[21] Pollock walked up to Greer and made a racial slur. In the ensuing shooting, Wolfe was hit in the chest and leg and fell to the ground. Greer retreated and resumed shooting from behind a wall near his apartment. Wolfe emptied his gun into the wall, hoping to stop Greer.

When the shooting stopped, Pollock helped Wolfe back into his apartment and left. Wolfe told the 911 operator that Greer had shot him. Wolfe acknowledged that he might have told a paramedic that Greer had come into the apartment and fired a shot. Wolfe did not see Lain in the confrontation.

Pollock testified that Wolfe called him on November 19, 2010, and said he was terrified for the safety of his family. Pollock responded by bringing Wolfe "a form of protection" that had saved Pollock's life in the past:

---

[19] Id. at 91.
[20] Id. at 133.
[21] Id. at 94.

The only reason my life was saved wasn't because I had a gun . . . it was because I had a big, scary, loud gun.[22]

Pollock knew that Wolfe had been selling some of the marijuana that Pollock gave him.

Pollock informed Wolfe that they were going over to talk to Greer and "tell them to just leave you alone."[23] Pollock armed himself with a concealed pistol and carried the shotgun wrapped in a blanket. Pollock, followed by Wolfe, walked over to Greer's apartment. When Pollock knocked, he heard "guns click"[24] and jumped back. Pollock shouted "Police. We know you have guns" and then "Leave my little brother and his family alone."[25]

When there was no response, Pollock and Wolfe started back toward Wolfe's apartment. As the two approached Wolfe's apartment, Greer appeared with a gun in his waistband. Pollock told Greer not to pull out the gun. When Greer started to reach for the gun, Pollock pulled the blanket off the shotgun. Greer jumped behind a wall.

In his statement to police after the shooting, Pollock said that he "move[d] towards [Greer] with the shotgun aimed, loaded with beanbags"[26] and that Greer turned and ran back through the open door of his apartment. At trial, Pollock explained that he pulled the blanket off the shotgun, but did not aim it directly at

---

[22] Id. at 14.
[23] Id. at 16.
[24] Id. at 17.
[25] Id.
[26] Ex. 13, at 6.

Greer. While Pollock pulled the blanket off, Greer jumped behind a wall and said, "Don't pull that gun. I have been shot. I don't want to be shot again."[27]

Pollock claimed that he then walked toward the wall, peeked around the corner, and asked Greer to leave Wolfe and his family alone. He and Wolfe then returned to Wolfe's apartment.

Pollock decided that Wolfe and his family should get away from the apartment. Pollock and Wolfe walked out the door, armed with the handguns. The shotgun and assault rifle remained in the apartment. As Pollock and Wolfe exited the apartment, Greer stood nearby with his hand on a gun, screaming and acting aggressively. Pollock repeatedly told Greer to leave Wolfe and his family alone. Pollock acknowledged that when Greer did not respond, he turned to Wolfe and made an "ignorant stupid" racial slur.[28] Pollock saw Lain standing behind Greer.

Pollock maintained that he was immediately hit by a bullet in the chest. As Pollock ran, another bullet hit him in the hand. Pollock then pulled out his handgun and returned fire. Greer hid behind a wall and continued firing. Pollock managed to return to Wolfe's apartment and grab the assault rifle. He then went outside and saw several members of what he believed to be Greer's "gang."[29]

---

[27] Report of Proceedings (Sept. 17, 2013) at 53-54.
[28] Id. at 26.
[29] Id. at 31.

By this time, the shooting had stopped. Pollock helped a wounded Wolfe back into his apartment. Pollock then left and drove himself to the hospital.

Based on the physical evidence, including blood drops, bullet casings and bullet strikes, police investigators concluded that the gunfight had occurred "around or just outside, or just inside the door"[30] to Greer's apartment, rather than farther down the walkway toward Wolfe's apartment. Kim Duddy, the defense's forensic expert, testified that the evidence indicated that no weapons were fired out of or into Greer's apartment, and that the shooting occurred near the alcove outside of Greer's apartment.

The State charged Pollock with separate counts of assault in the first degree against Greer and Lain. Both counts alleged that Pollock was armed with a firearm.

A short time after the incident, Pollock approached the police and asked to provide his account of the events. In the recorded interview, Pollock acknowledged that he brought the weapons to Wolfe's apartment, attempted to contact Greer at his apartment, and directed a racial slur at Greer. He maintained that he had acted only in self-defense after Greer opened fire. After a CrR 3.5 hearing, the trial court ruled that Pollock's statements were admissible.

The jury acquitted Pollock of both counts of assault in the first degree and found him guilty of a single count of the lesser offense of assault in the second

---

[30] Report of Proceedings (Sept. 16, 2013) at 31.

degree for assaulting Greer with a firearm. Following the verdict, Pollock moved to arrest judgment, arguing that the evidence was insufficient and that the State failed to establish the corpus delicti. The court denied the motion and imposed a 39-month standard range sentence, including firearm enhancement.

## SUFFICIENCY OF THE EVIDENCE

At trial, the State alleged that Pollock committed the lesser offense of assault in the second degree when he pointed the handgun at Greer's head and when "he charged at Nigel Greer with a shotgun pointed – loaded, obviously – and basically chased him back into his apartment."[31] The trial court instructed the jury that it needed to unanimously agree as to which specific act constituted the charged assault.

On appeal, Pollock concedes that the evidence was sufficient to prove that Pollock pointed the handgun at Greer's head. He argues that the State failed to prove any assault with the shotgun.

We review Pollock's challenge by determining whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt.[32] A challenge to the sufficiency of the evidence admits the truth of the State's evidence and any reasonable inferences from it.[33] Circumstantial evidence and

---

[31] Report of Proceedings (Sept. 19, 2013) at 119.
[32] State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).
[33] Id.

direct evidence are equally reliable.[34] As charged here, the State had to prove that Pollock committed an assault "done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury . . . ."[35]

Both Wolfe and Pollock testified that Pollock carried the shotgun when they went to Greer's apartment to intimidate him. Pollack admitted that when confronting Greer, he removed the blanket from the shotgun, causing Greer to jump behind a wall shouting "Don't pull that gun." In his statement to police, Pollock said that he moved toward Greer with "the shotgun aimed," causing Greer to turn and flee into his apartment.

Pollock explained at trial that he did not aim the shotgun directly at Greer. But the circumstances surrounding Pollock's display of the shotgun and Greer's immediate reaction were sufficient to permit the jury to find beyond a reasonable doubt that Pollock assaulted Greer with the intent to create apprehension and fear of bodily injury and that Pollock's actions created in Greer a reasonable apprehension and imminent fear of bodily injury. The evidence was sufficient to support Pollock's conviction for assault in the second degree.

Pollock maintains that the evidence was insufficient because neither Greer nor Lain testified that Pollock charged or displayed the shotgun, and Greer

---

[34] State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).
[35] Instruction 9, Clerk's Papers at 121.

denied even seeing the shotgun. Pollock argues that because Greer did not see the shotgun, Pollock's actions could not, as a matter of law, have created a reasonable apprehension and imminent fear of bodily injury.

Pollock's arguments rest on the mistaken assumption that the jury was required to accept Greer's testimony at face value. But the trier of fact "is the sole and exclusive judge of the evidence."[36] An appellate court "must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence."[37]

In resolving the charges against Pollock, the jury here had to assess the credibility of four different and inconsistent accounts of the shooting. The jury necessarily made credibility determinations when it acquitted Pollock of the assault charge against Lain and found him guilty of assault in the second degree for assaulting Greer. Based on the physical evidence, a rational trier of fact could have chosen to disbelieve Greer's account of the location of the gunfight and Pollock's claim of self-defense, but still found Pollock's account of the circumstances surrounding the display of the shotgun to be credible. Pollock's arguments on appeal regarding the credibility of the evidence are properly directed to the trier of fact, not this court.

---

[36] State v. Hathaway, 161 Wn. App. 634, 645, 251 P.3d 253 (2011).
[37] State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

-12-

No. 71254-3-I/13

## CORPUS DELICTI

As part of his challenge to the sufficiency of the evidence, Pollock contends that the State failed to establish the corpus delicti of assault in the second degree. He argues that the State failed to present any independent evidence corroborating his admission that he lunged at Greer with the shotgun.

Under the corpus delicti rule, a defendant's extrajudicial confession or admission is not admissible unless there is independent evidence "that the crime charged has been committed by someone."[38] The independent evidence need not be sufficient to support a conviction, "but it must provide prima facie corroboration of the crime described in a defendant's incriminating statement."[39] Prima facie corroboration exists if the independent evidence supports a "logical and reasonable inference of the facts sought to be proved."[40] In assessing the sufficiency of the independent evidence, we assume the truth of the State's evidence and draw all reasonable inferences in the light most favorable to the State.[41] Our review is de novo.[42]

---

[38] State v. Dodgen, 81 Wn. App. 487, 492, 915 P.2d 531 (1996).
[39] State v. Brockob, 159 Wn.2d 311, 328, 150 P.3d 59 (2006) (emphasis omitted).
[40] State v. Vangerpen, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995).
[41] State v. Aten, 130 Wn.2d 640, 658, 927 P.2d 210 (1996).
[42] State v. Pineda, 99 Wn. App. 65, 77-78, 992 P.2d 525 (2000).

The State relies on cases supporting its claim that Pollock waived the corpus delicti issue because he failed to raise an objection at trial.[43] Pollock argues that he preserved the issue by raising it in his post-trial motion to arrest judgment, noting that our supreme court has addressed corpus delicti claims raised for the first time in a post-trial motion.[44] But even if Pollock preserved his corpus delicti challenge for review, his arguments fail.

Because Pollock did not raise his corpus delicti challenge until after trial, a court may consider all of the trial testimony, including a defendant's testimony, in determining whether independent evidence established the corpus delicti.[45] Here, Wolfe testified that Pollock was carrying the shotgun when he and Pollock went to intimidate Greer. Lain testified that she stood nearby as Pollock held the shotgun and aggressively confronted Greer. Pollock's own trial testimony essentially corroborated his statements to the police. Pollock testified that in response to his removal of the blanket from the shotgun, Greer jumped back behind a wall, shouting "Don't pull that gun." Viewed in the light most favorable

---

[43] See Dodgen, 81 Wn. App. at 492 (The corpus delicti rule "is a judicially created rule of evidence, not a constitutional sufficiency of the evidence requirement, and a defendant must make [a] proper objection to the trial court to preserve the issue.") (citing State v. C.D.W., 76 Wn. App. 761, 763-64, 887 P.2d 911 (1995)).

[44] See Brockob, 159 Wn.2d at 320; see also State v. Grogan, 158 Wn. App. 272, 275-76, 246 P.3d 196 (2010).

[45] State v. Mathis, 73 Wn. App. 341, 347, 869 P.2d 106 (1994) (where defendant first raised challenge during jury deliberations, trial court properly considered defendant's trial testimony and other trial evidence in determining sufficiency of evidence establishing corpus delicti).

to the State, the independent evidence established the corpus delicti of assault in the second degree as charged here.

**REASONABLE DOUBT INSTRUCTION**

Pollock contends that the instruction defining reasonable doubt as a doubt "for which a reason exists" was constitutionally deficient because it required the jury to articulate a reason for having a reasonable doubt. Relying on State v. Emery,[46] Pollock also argues that the instruction resembles the improper "fill in the blank" arguments that may constitute prosecutorial misconduct. In a supplemental assignment of error, Pollock contends that he was denied effective assistance when defense counsel "endorse[d]" the reasonable doubt instruction, rather than objecting to it.

Pollock concedes that the trial court instructed the jury on reasonable doubt using Washington Pattern Jury Instruction: Criminal 4.01 (WPIC)[47] and that our supreme court has directed trial courts to use WPIC 4.01 to instruct juries on the burden of proof and the definition of reasonable doubt.[48] In State v. Kalebaugh, the supreme court recently reaffirmed that WPIC 4.01 was "the

---

[46] 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

[47] "A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt." Instruction 3, Clerk's Papers at 115.

[48] . State v. Bennett, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007); see also State v. Castillo, 150 Wn. App. 466, 469, 208 P.3d 1201 (2009).

correct legal instruction on reasonable doubt . . . ."[49] After correctly instructing the jury during preliminary remarks that reasonable doubt was "a doubt for which a reason <u>exists</u>," the trial judge in <u>Kalebaugh</u> paraphrased the explanation as "a doubt for which a reason <u>can be given</u>."[50] In concluding that the error in the trial judge's "offhand explanation of reasonable doubt"[51] was harmless beyond a reasonable doubt, the Court rejected any suggestion that WPIC 4.01 required the jury to articulate a reason for having a reasonable doubt or was akin to an improper "fill in the blank" argument.[52] Pollock's challenge to WPIC 4.01 must be directed to our supreme court.[53]

Because the trial court did not err in giving the reasonable doubt instruction, Pollock's claim of ineffective assistance also fails.

### STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

In his statement of additional grounds for review, Pollock contends that defense counsel was constitutionally deficient because he failed to file certain motions and failed to interview all of the State's witnesses before trial started.

---

[49] <u>State v. Kalebaugh</u>, No. 89971-1, July 9, 2015, Slip. Op. at 8-9.

[50] <u>Id.</u> at 7 (emphasis in original).

[51] <u>Id.</u> at 9.

[52] "We do not agree that the judge's effort to explain reasonable doubt was a directive to convict unless a reason was given or akin to the 'fill in the blank' approach that we held improper in <u>State v. Emery</u>." <u>Id.</u> at 8.

[53] <u>See also</u> <u>State v. Thompson</u>, 13 Wn. App. 1, 4-5, 533 P.2d 395 (1975) (the phrase "a doubt for which a reason exists" does not direct the jury "to assign a reason for their doubts"); <u>State v. Fedorov</u>, 181 Wn. App. 187, 199-200, 324 P.3d 784, <u>review denied</u>, 181 Wn.2d 1009 (2014) ("abiding belief in the truth" language in WPIC 4.01 is not comparable to improper "speak the truth" argument").

Pollock relies primarily on a letter from defense counsel apologizing for the outcome of the trial and acknowledging that "there were clearly some areas that I could have done more and done better for you."[54]

But Pollock has not identified the specific nature of counsel's alleged deficient performance or the resulting prejudice. His allegations are therefore too conclusory to address. See RAP 10.10(c) (appellate court will decline to consider issues in statement of additional grounds for review if they do not "inform the court of the nature and occurrence of alleged errors"). In any event, Pollock's allegations rest on matters that are outside the record and therefore cannot be addressed in a direct appeal.[55]

We affirm the judgment and sentence.

Cox, J.

WE CONCUR:

---

[54] Statement of Additional Grounds (Jan. 7, 2015) at 5.
[55] See State v. McFarland, 127 Wn.2d 322, 337-38, 899 P.2d 1251 (1995).

-17-