IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION  II

| STATE OF WASHINGTON, | No.  47647-9-II |
| --- | --- |
| Respondent, | |
| v. | |
| ELIZABETH B. JENSON, | PART PUBLISHED OPINION |
| Appellant. | |

JOHANSON, P.J. — A jury found Elizabeth Jenson guilty of two counts of first degree identity theft, two counts of second degree theft, one count of second degree identity theft, and one count of third degree theft.  Jenson appeals her convictions and sentence.  In the published portion of the opinion, we hold that the trial court's reasonable doubt instruction did not improperly focus the jury on a search for "the truth."  In the unpublished portion of the opinion, we conclude that the charging document is constitutionally sufficient, that the identity theft statute is constitutional, and that the trial court properly calculated Jenson's offender score.  We affirm Jensen's convictions and sentence.

REASONABLE DOUBT INSTRUCTION

Jenson argues that the trial court's reasonable doubt jury instruction improperly focused the jury on a "search for the truth."  We reject this argument and adopt the reasoning in *State v. Fedorov*, 181 Wn. App. 187, 324 P.3d 784, *review denied*, 181 Wn.2d 1009 (2014).

We review a challenged jury instruction de novo, evaluating it in the context of the instructions as a whole. *State v. Brett*, 126 Wn.2d 136, 171, 892 P.2d 29 (1995). Although no specific wording is required, jury instructions must define reasonable doubt and clearly communicate that the State carries the burden of proof. *State v. Bennett*, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007).

Here, the trial court instructed the jury based on 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.01, at 85 (3d ed. 2008), which provides,

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. [If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.]

The trial court included the optional bracketed language. Our Supreme Court has approved this "abiding belief in the truth" language. *State v. Pirtle*, 127 Wn.2d 628, 658, 904 P.2d 245 (1995).

Jenson, acknowledging that the phrase "abiding belief in the truth" passes constitutional muster, admits that she does not challenge the use of that phrase. Rather, she challenges what she calls the instruction's focus on "the truth." She cites *State v. Emery*, arguing that the "belief in the truth" language is similar to the impermissible "speak the truth" remarks made by the State during closing argument in *Emery*. 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

But in *Fedorov*, Division One of this court rejected the argument that Jenson makes here—that this "'belief in the truth'" language encourages the jury to undertake an impermissible search for the truth. 181 Wn. App. at 199-200. *Fedorov* reasoned that language was not analogous to the remarks at issue in *Emery*. 181 Wn. App. at 200. The *Fedorov* court held that the instructions precisely stated the law because the "belief in the truth" phrase "accurately informs the jury its

2

'job is to determine whether the State has proved the charged offenses beyond a reasonable doubt.'" 181 Wn. App. at 200 (quoting *Emery*, 174 Wn.2d at 760).

We adopt Division One's reasoning in *Fedorov*. The circumstances in *Emery* are different than those here. To invite a jury to declare the truth mischaracterizes the jury's role, suggesting that its role is to solve the case. *Emery*, 174 Wn.2d at 760. The existence or nonexistence of an "abiding belief in the truth," however, correctly invites the jury to weigh the evidence. We, therefore, hold that the trial court's instruction accurately defined reasonable doubt and clearly communicated the State's burden of proof. Jenson's argument fails. We affirm her convictions and sentence.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

FACTS

I. BACKGROUND FACTS

Jack Falk was a man of limited means. He lived in an apartment run by the Tacoma Rescue Mission and Social Security is his only income. Falk needed assistance managing his finances. Jenson, a mission employee, assisted Falk by paying his monthly bills and regulating his spending money.

Falk had several active bank accounts, some of which he shared with Jenson while others were maintained solely in Falk's name. Jenson was designated as payee for one of Falk's accounts, and the two also shared a separate joint account from which either Jenson or Falk could make

withdrawals. Jenson had her own separate checking account that was unrelated to her management of Falk's finances.

Falk's bills were few, and his spending habits were basic and consistent. But in 2014, Falk approached his friend, Mark Sylvester, with concerns about irregular spending from his accounts. Sylvester reviewed Falk's accounts and concluded that some charges did not make sense.

Detective Elizabeth Schieferdecker examined both Falk's and Jenson's bank accounts. She concluded there was a copious amount of unexplained charges and transfers involving Falk's accounts, the vast majority of which appeared to be facilitated by Jenson over a period of years. Satisfied that Jenson was engaged in criminal activity, Detective Schieferdecker arrested Jenson. Falk's total financial loss attributed to Jenson was $8,254.38.

## II. PROCEDURAL FACTS

The State charged Jenson with two counts of first degree identity theft, two counts of second degree theft, one count of second degree identity theft, and one count of third degree theft based on different date ranges from 2011 to 2014. The charging document charged Jenson with first degree identity theft in count I and alleged

> [t]hat ELIZABETH B JENSON, in the State of Washington, during the period between the 5th day of July, 2011 and the 11th day of April, 2014, did unlawfully, feloniously, knowingly obtain, possess, use or transfer a means of identification or financial information of another person, living or dead, to-wit: Jack Falk, with the intent to commit, or to aid or abet, any crime and thereby obtains an aggregate total of credit, money, goods, service, or anything else of value in excess of one thousand five hundred dollars.

Clerk's Papers (CP) at 44. Regarding each of the other five counts, the charging document referred specifically to Jenson having committed the crimes as part of a "series of acts connected together

or constituting parts of a single scheme or plan." CP at 45-47. Jenson did not request a bill of particulars.

At trial, the State laboriously and meticulously questioned Detective Schieferdecker regarding each suspicious charge and withdrawal from each of Falk's accounts in chronological order. Jenson testified in her own defense. The jury found Jenson guilty as charged.

The trial court calculated Jenson's offender score as two based on a finding that counts I and II (first degree identity theft and second degree theft) were the same criminal conduct and counts III and IV (additional counts of first degree identity theft and second degree theft) were the same criminal conduct, but were separate crimes from counts I and II. Jenson appeals.

ANALYSIS

I. SUFFICIENT CHARGING DOCUMENT

Jenson argues that reversal is required because the State failed to allege in the charging document that she committed multiple acts of theft and identity theft as part of a common scheme or plan, which, in her view, is an essential element of the crime. We disagree.

We review a challenge to the sufficiency of a charging document de novo. *State v. Williams*, 162 Wn.2d 177, 182, 170 P.3d 30 (2007).

A charging document must allege "[a]ll essential elements of a crime, statutory or otherwise" to provide a defendant with sufficient notice of the nature and cause of the accusation against her. *State v. Kjorsvik*, 117 Wn.2d 93, 97, 812 P.2d 86 (1991); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. To satisfy this requirement, the charging document must allege (1) "every element of the charged offense" and (2) "particular facts supporting them." *State v. Nonog*, 169 Wn.2d 220, 226, 237 P.3d 250 (2010) (citing *State v. Vangerpen*, 125 Wn.2d 782, 787, 888

P.2d 1177 (1995); *State v. Leach*, 113 Wn.2d 679, 688, 782 P.2d 552 (1989)); *see also State v. Simms*, 171 Wn.2d 244, 250, 250 P.3d 107 (2011). The primary purpose of the rule is to give the defendant sufficient notice of her charges so she can prepare an adequate defense. *State v. Tandecki*, 153 Wn.2d 842, 846, 109 P.3d 398 (2005). Where the charging document's sufficiency is challenged for the first time on appeal, we construe the document liberally in favor of validity. *State v. Brown*, 169 Wn.2d 195, 197, 234 P.3d 212 (2010).

To determine whether a charging document is sufficient, we ask whether the necessary facts appear in any form or by fair construction can they be found in the charging document and, if so, can the defendant show that she was actually prejudiced by the inartful language which caused a lack of notice?[1] *Kjorsvik*, 117 Wn.2d at 105-06. If the necessary elements are neither found nor fairly implied in the charging document, we presume prejudice and reverse without reaching the question of prejudice. *State v. Goodman*, 150 Wn.2d 774, 788, 83 P.3d 410 (2004). We read the charging document as a whole, according to common sense, and including implied facts. *Nonog*, 169 Wn.2d at 227. We read the charging document in this way to see if it "'reasonably apprise[s] an accused of the elements of the crime charged.'" *Nonog*, 169 Wn.2d at 227 (alteration in original) (quoting *Kjorsvik*, 117 Wn.2d at 109).

In *State v. Rivas*, this court held that a charging document in a malicious mischief case was deficient for failing to allege that the crimes had been committed as part of a common scheme or plan where the State aggregated the total damages to elevate the charge from two third degree

---

[1] Jenson makes no attempt to demonstrate that she was prejudiced by the alleged inartful language in the charging document. She argues only that the essential element that her crimes were part of a common scheme or plan was not alleged and, therefore, she lacked notice of the same. Thus, we do not address prejudice.

crimes to one second degree crime. 168 Wn. App. 882, 890, 278 P.3d 686 (2012). When the State is permitted by statute to aggregate multiple distinct acts to meet the threshold to charge a more serious degree, the fact that the crimes were committed as part of a common scheme or plan is an essential element of the crime that must be alleged in the charging document. *Rivas*, 168 Wn. App. 889-90. The same is true here because RCW 9.35.020(5) specifically provides,

> Whenever any series of transactions involving a single person's means of identification or financial information which constitute identity theft would, when considered separately, constitute identity theft in the second degree because of value, and the series of transactions are a part of a common scheme or plan, then the transactions may be aggregated in one count and the sum of the value of all of the transactions shall be the value considered in determining the degree of identity theft involved.

In *Rivas*, the State conceded that it had failed to allege in its charging document that it aggregated the multiple crimes to elevate the crime to a higher degree or provided notice that the crimes were considered as part of a common scheme or plan. 168 Wn. App. at 890. But here, the State expressly described the charged crimes in the charging document as part of a common scheme or plan in every charge except for count I of first degree identity theft.

And even in count I, the charging document informed Jenson that she had "obtain[ed] an *aggregate* total of credit, money, goods, service, or anything else of value in excess of one thousand five hundred dollars." CP at 44. As mentioned, each of the other five charges specifically alleged that the crimes were charged as part of a common scheme or plan. And each identity theft count included different, albeit somewhat overlapping, charging periods that also show the State intended to charge several instances of theft over a period of years as one collective scheme or

plan.[2] Read together, the charging document provided notice to Jenson that the crimes charged were part of a common scheme or plan.

Although the specific count at issue must charge all of the elements of the crime, we may consider the whole charging document when liberally construing it to see if it reasonably apprises an accused of the elements of the crime charged. *Nonog*, 169 Wn.2d at 228. When read in its entirety here, the charging document fairly and reasonably apprised Jenson of the elements of the crimes charged such that it provided sufficient notice and permitted Jenson to prepare an adequate defense. We hold that the "common scheme or plan" aspect of Jenson's crime can be read into, or at least "fairly implied," in the charging document. *Goodman*, 150 Wn.2d at 788.

## II. OVERBREADTH

Jenson argues that RCW 9.35.020 is unconstitutionally overbroad because it criminalizes "thought." We disagree.

We review a ruling on the constitutionality of a legislative enactment de novo. *State v. Blilie*, 132 Wn.2d 484, 489, 939 P.2d 691 (1997); *City of Spokane v. Neff*, 152 Wn.2d 85, 88, 93 P.3d 158 (2004). "'A law is overbroad if it sweeps within its prohibitions constitutionally protected free speech activities.'" *State v. Glas*, 147 Wn.2d 410, 419, 54 P.3d 147 (2002) (internal quotation marks omitted) (quoting *City of Seattle v. Webster*, 115 Wn.2d 635, 641, 802 P.2d 1333 (1990)). "'The First Amendment overbreadth doctrine may invalidate a law on its face only if the law is substantially overbroad. In determining overbreadth, a court's first task is to determine

---

[2] For count I, the State alleged that the identity theft occurred between July 2011 and April 2014. For count III, the State alleged that the identity theft occurred between May 2011 and May 2013. For count V, the State alleged that the identity theft occurred between September 2011 and February 2014.

whether the enactment reaches a substantial amount of constitutionally protected conduct.'" *Glas*, 147 Wn.2d at 419 (internal quotation marks omitted) (quoting *Webster*, 115 Wn.2d at 641).

Criminal statutes require particular scrutiny and may be facially invalid if they "'make unlawful a substantial amount of constitutionally protected conduct . . . even if they also have legitimate application.'" *Webster*, 115 Wn.2d at 641 (alteration in original) (internal quotation marks omitted) (quoting *City of Seattle v. Huff*, 111 Wn.2d 923, 925, 767 P.2d 572 (1989)). An ordinance which regulates behavior and not pure speech "'will not be overturned unless the overbreadth is both real and substantial in relation to the ordinance's plainly legitimate sweep.'" *Webster*, 115 Wn.2d at 641 (internal quotation marks omitted) (quoting *City of Seattle v. Eze*, 111 Wn.2d 22, 31, 759 P.2d 366 (1988)).

Jenson contends that RCW 9.35.020[3] is unconstitutional because it criminalizes "thought." She argues that someone who looks through a telephone book or e-mails intending to commit a

---

[3] RCW 9.35.020 states,

(1) No person may knowingly obtain, possess, use, or transfer a means of identification or financial information of another person, living or dead, with the intent to commit, or to aid or abet, any crime.

(2) Violation of this section when the accused or an accomplice violates subsection (1) of this section and obtains credit, money, goods, services, or anything else of value in excess of one thousand five hundred dollars in value shall constitute identity theft in the first degree. Identity theft in the first degree is a class B felony punishable according to chapter 9A.20 RCW.

(3) A person is guilty of identity theft in the second degree when he or she violates subsection (1) of this section under circumstances not amounting to identity theft in the first degree. Identity theft in the second degree is a class C felony punishable according to chapter 9A.20 RCW.

(4) Each crime prosecuted under this section shall be punished separately under chapter 9.94A RCW, unless it is the same criminal conduct as any other crime, under RCW 9.94A.589.

(5) Whenever any series of transactions involving a single person's means of identification or financial information which constitute identity theft would, when considered separately, constitute identity theft in the second degree because

crime is guilty of identity theft under the statute.  But Jenson does not explain how this would be

so and fails to account for the statute's requirement that an overt act with the necessary criminal

intent is what constitutes the crime.  *City of Seattle v. Slack* is instructive.  113 Wn.2d 850, 784

P.2d 494 (1989).

In *Slack*, a Seattle loitering statute survived an overbreadth challenge that at least arguably

criminalized constitutionally-protected conduct and free speech activities.  113 Wn.2d at 856.  Our

Supreme Court so held because the ordinance only prohibited conduct that required a specific

intent to engage in an illicit act.  *Slack*, 113 Wn.2d at 855.  Later cases followed this reasoning,

concluding that criminal statutes were not overbroad when they contained a specific mens rea

---

of value, and the series of transactions are a part of a common scheme or plan, then the transactions may be aggregated in one count and the sum of the value of all of the transactions shall be the value considered in determining the degree of identity theft involved.

(6)  Every person who, in the commission of identity theft, shall commit any other crime may be punished therefor as well as for the identity theft, and may be prosecuted for each crime separately.

(7)  A person who violates this section is liable for civil damages of one thousand dollars or actual damages, whichever is greater, including costs to repair the victim's credit record, and reasonable attorneys' fees as determined by the court.

(8)  In a proceeding under this section, the crime will be considered to have been committed in any locality where the person whose means of identification or financial information was appropriated resides, or in which any part of the offense took place, regardless of whether the defendant was ever actually in that locality.

(9)  The provisions of this section do not apply to any person who obtains another person's driver's license or other form of identification for the sole purpose of misrepresenting his or her age.

(10)  In a proceeding under this section in which a person's means of identification or financial information was used without that person's authorization, and when there has been a conviction, the sentencing court may issue such orders as are necessary to correct a public record that contains false information resulting from a violation of this section.

component combined with an overt act before conduct was deemed criminal. *See, e.g.*, *City of Tacoma v. Luvene*, 118 Wn.2d 826, 843-44, 827 P.2d 1374 (1992).

Here, a person commits identity theft under RCW 9.35.020(1) only if they "knowingly obtain, possess, use, or transfer a means of identification or financial information of another person, living or dead, with the *intent* to commit, or to aid or abet, any crime." (Emphasis added.) The statute, therefore, criminalizes only a specific overt act along with the associated mens rea, the specific criminal intent to commit a crime. RCW 9.35.020. Thus, the identity theft statute does not make "thought" a crime as Jenson alleges. Rather, the statute renders behavior criminal when the culpable mental state coexists with identifiable, articulable conduct. *See Luvene*, 118 Wn.2d at 843-44.

When the statute is read as a whole, the legislature's intent was to punish persons who obtain, possess, use, or transfer the personal and financial records of others intending to advance criminal activity. RCW 9.35.020(1). We hold that Jenson's argument fails.

### III. CRIMES NOT SAME CRIMINAL CONDUCT

Jenson argues that the trial court miscalculated her offender score because it did not consider all of her crimes as the same criminal conduct. Again, we disagree.

All of a defendant's prior or current convictions are counted separately for offender score calculations unless some or all of the convictions are the same criminal conduct. RCW 9.94A.589(1)(a). Convictions are the same criminal conduct if the convictions meet three statutory elements: (1) required the same criminal intent, (2) were committed at the same time and place, and (3) involved the same victim. RCW 9.94A.589(1)(a). We review the trial court's same criminal conduct finding for a "'clear abuse of discretion or misapplication of the law.'" *State v.*

*Haddock*, 141 Wn.2d 103, 110, 3 P.3d 733 (2000) (quoting *State v. Elliott*, 114 Wn.2d 6, 17, 785 P.2d 440 (1990)).

Because a same criminal conduct finding lowers the defendant's presumed offender score, the defendant must prove that her prior convictions are the same criminal conduct. *State v. Graciano*, 176 Wn.2d 531, 540, 295 P.3d 219 (2013). If the defendant fails to prove any one of the three statutory elements, the defendant has failed to meet her burden to prove that her prior convictions are the same criminal conduct. *Graciano*, 176 Wn.2d at 540.

Here, Jenson primarily argues that all of her crimes should have been treated as the same criminal conduct because all five crimes involved the same victim and the same criminal intent. But Jenson ignores that the crimes occurred over a period of multiple years from 2011 to 2014 with several specifically identified instances of theft from more than one of Falk's accounts.

Detective Schieferdecker testified that her investigation revealed several suspicious charges and she could identify the specific day and year of those charges or withdrawals. The evidence indicated that the crimes occurred at various periods of time. And when a defendant fails to establish either that the crimes involved the same intent, victim, and time and place, a challenge to the court's refusal to consider the convictions as the same criminal conduct fails. *Graciano*, 176 Wn.2d at 540.

Given the record and the evidence, we hold that the trial court did not abuse its discretion because its ruling was not unreasonable or based on untenable grounds or reasons.

## IV. APPELLATE COSTS

Jenson requests that we waive appellate costs, arguing that she cannot pay. We agree.

No. 47647-9-II

We give an indigent party the benefit of an order of indigency throughout our review unless the trial court finds that the party's financial condition has improved to the extent that the party is no longer indigent. RAP 15.2(f). Here, the trial court entered an order of indigency following the jury's guilty verdicts. Nothing in the record suggests that Jenson's financial condition has improved. The likelihood that Jenson can pay appellate costs following her incarceration is minimal. We, therefore, decline to impose appellate costs.

We affirm Jenson's convictions and sentence.

JOHANSON, P.J.

We concur:

LEE, J.

SUTTON, J.