[No. 27079-6-I.   Division One.   March 30, 1992.]

THE STATE OF WASHINGTON, *Respondent,* v. LEANDER BRYANT, *Appellant.*

*Mary Jane Ferguson* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Peter Goldman, Deputy,* for respondent.

AGID, J. — Leander Bryant appeals his conviction for second degree felony murder in the death of his wife, Doris Bryant. Bryant argues that the trial court erred in permitting testimony regarding statements made by a 3-year-old witness under the excited utterance exception to the hearsay rule. He also contends that the information charging him with second degree felony murder was constitutionally defective for failing to allege all the elements of the crime. We affirm.

On March 9, 1990, paramedics were summoned after Leander Bryant ran down the hallway of an apartment building banging on doors and yelling for help. They found Doris Bryant lying naked and unconscious in a bathtub, bleeding from wounds to her head and face. Neighbors testified that they had heard yelling and banging coming from the apartment all day.[1] Mrs. Bryant's wounds included lacer-

---

[1] At trial, Bryant testified that he and his wife were arguing that day and that his wife tried to swallow medicine in a suicide attempt. He stated that he grabbed the medicine, flushed it down the toilet, and hit her several times in

ations on her face, neck and ear, a black eye, and head injuries that caused her brain to hemorrhage in eight different areas and to herniate, forcing it down into the spinal canal. All these injuries were caused by blunt impacts or blows. Mrs. Bryant's blood was found in various places on the walls, carpet and in the bathroom, as were clumps of her hair, some of which showed signs of having been forcibly torn out. Hair and blood were also found in a dent in the wall and along the edge of the bathtub. Her bloody shirt was later found in a toy box. Mrs. Bryant was airlifted to Harborview Hospital but died of her wounds on March 11, 1990.

The only other person in the apartment that evening was the Bryants' 3-year-old granddaughter, Cedrika Young. Cedrika was found by a neighbor, Anjanette Haines, standing in a corner of the bathroom where her grandmother lay unconscious, looking frightened and in shock, but not crying. Haines took Cedrika out into the hallway outside the apartment where people were standing and speculating as to what had happened. Haines testified that Cedrika volunteered "out of the blue" that "grandpa hit grandma". Haines then called Officer Sarver over, who asked Cedrika, "what happened?" Cedrika answered, "grandpa hit grandma", "grandpa was hitting grandma on the wall", and "grandma had blood on her". Haines then took Cedrika to her own apartment where she played with her to try to take her mind off what had happened. In response to Haines' efforts, Cedrika "lightened up" and became more playful.

About an hour later, Detective Mullinax came into the apartment to speak with Cedrika and, like Officer Sarver, asked her what happened. Cedrika again stated that "grandpa hit grandma". When asked, Cedrika indicated that he had used something similar to a metal chair leg. Bryant's sister, Gloria Bryant, arrived during this interview and later testified that, in addition to saying that "grandpa hit grandma", Cedrika stated that she was Freddy Kruger

---

the face, telling her he would not let her kill herself, which caused her to start bleeding. A little while later, on investigating a crash from the bedroom, he found her passed out and, he claimed, accidentally banged her head several more times in dragging her to the bathtub to wake her up.

and Batman, and that "grandpa had a stick that reached the sky".

# I
## EXCITED UTTERANCES

Bryant argues that the trial court abused its discretion in permitting testimony under the excited utterance exception to the hearsay rule, ER 803(a)(2), about the content of statements made by 3-year-old Cedrika. A determination concerning the admissibility of statements offered under this exception to the hearsay rule is within the sound discretion of the trial court and is reviewable only for abuse of that discretion. *Brewer v. Copeland*, 86 Wn.2d 58, 73, 542 P.2d 445 (1975). The excited utterance exception[2] provides:

> **Specific Exceptions.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (2) *Excited Utterance.* A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

ER 803(a)(2). The comment to subsection (a)(2) observes that this exception is consistent with previous Washington law, as expressed in *Beck v. Dye*, 200 Wash. 1, 9-10, 92 P.2d 1113, 127 A.L.R. 1022 (1939):

> (1) The statement or declaration made must relate to the main event and must explain, elucidate, or in some way characterize that event; (2) it must be a natural declaration or statement growing out of the event, and not a mere narrative of a past, completed affair; (3) it must be a statement of fact, and not the mere expression of an opinion; (4) it must be a spontaneous or instinctive utterance of thought, dominated or evoked by the transaction or occurrence itself, and not the product of premeditation, reflection, or design; (5) while the declaration or statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption

---

[2]While "res gestae" and "excited utterance" are often used interchangeably, as by the parties here, the proper term is "excited utterance". *State v. Schimmelpfennig*, 92 Wn.2d 95, 99 n.1, 594 P.2d 442 (1979); *State v. Canida*, 4 Wn. App. 275, 277 n.1, 480 P.2d 800 (1971) (the phrase "res gestae" has long been entirely useless and could well be jettisoned).

that it is the result of deliberation, and (6) it must appear that the declaration or statement was made by one who either participated in the transaction or witnessed the act or fact concerning which the declaration or statement was made.

Such a statement need not be completely spontaneous; rather, under certain circumstances, the statement may be made in response to a question. *Johnston v. Ohls*, 76 Wn.2d 398, 406, 457 P.2d 194 (1969). The crucial question is whether the declarant was still under the influence of the event so as to preclude any chance of fabrication, intervening influences, or the exercise of choice or judgment. *Johnston*, 76 Wn.2d at 406; *State v. John Doe*, 105 Wn.2d 889, 893, 719 P.2d 554 (1986). Where a child is very young, his or her tender age has been regarded as an additional indication of the child's reliability, since it makes more remote the possibility that the statements were fabricated. *State v. Hieb*, 39 Wn. App. 273, 278-79, 693 P.2d 145 (1984) (referring to 3-year-old witness), *rev'd on other grounds*, 107 Wn.2d 97, 727 P.2d 239 (1986); *State v. Canida*, 4 Wn. App. 275, 278, 480 P.2d 800 (1971) (the young age of the child lessened the danger of fabrication during the interval of time between exposure and response).

Cedrika's assertions were simple statements of fact that explain circumstances — including her grandmother's condition and the blood on the walls — to which she was a witness.[3] The statements were made without prompting.

---

[3]Bryant's argument that the State did not demonstrate that Cedrika had personal knowledge of the event is without merit. First, the trial court was clearly justified in inferring that Cedrika had personal knowledge that Bryant hit the victim's head against the wall. There was independent evidence of a dent in the wall with blood and hair in it, and neighbors testified that they had heard banging from the apartment all day. Further, Anjanette Haines testified that, when she found Cedrika, the child was standing where she could see everything. Patricia Haines, Anjanette's sister, testified that Anjanette found Cedrika standing in a corner of the bathroom where her grandmother was lying. Bryant also does not dispute that Cedrika was in the apartment that evening. He stated that he sent her to watch television after she followed him and his wife into the bedroom while they were fighting and that he later saw her asleep on the couch. However, Bryant was unwilling to say that Cedrika hadn't seen him hit his wife. Bryant's reliance on *Makoviney v. Svinth*, 21 Wn. App. 16, 584 P.2d 948 (1978), *review denied*, 91 Wn.2d 1010 (1979) and *State v. Oughton*, 26 Wn. App. 74, 612

Anjanette Haines' testimony that Cedrika appeared frightened and in shock when she found her, together with the nature and duration of the violence that day, supports the inference that Cedrika was still under the influence of the event at the time she made the statements.[4] That the statements were not the product of premeditation or deliberation is suggested both by their proximity in time to the events, and by the fact that a 3-year-old lacks the sophistication to understand and choose among the various answers she could have given and their consequences. Haines' testimony that Cedrika first volunteered the statement that her grandfather had hit her grandmother "out of the blue" also tends to negate any inference that intervening conversations influenced the content of the statement.[5] Under these

---

P.2d 812, *review denied*, 94 Wn.2d 1005 (1980) for his contention that more need be demonstrated in the way of personal knowledge than suggested by the factors enumerated in *Beck*, 200 Wash. at 9-10, is misplaced. *Makoviney* involved a statement allegedly made by an unidentified third person that might have been intended as an expression of sympathy or regret and was not clearly made under the stress of reacting to the event. 21 Wn. App. at 21-22. *Oughton* involved a statement made by a witness who both sides agreed was not present at the time of the incident with respect to which he testified. 26 Wn. App. at 80.

Bryant also did not object to the admissibility of Cedrika's statements at trial on the basis that she lacked personal knowledge. Objections to the admission of evidence will not be considered for the first time on appeal unless based upon the same ground asserted at trial. *State v. Stevens*, 58 Wn. App. 478, 485-86, 794 P.2d 38, *review denied*, 115 Wn.2d 1025 (1990).

[4]Bryant's argument that Cedrika was not sufficiently "excited" for purposes of the excited utterance exception is also without merit. As noted above, the focus of the inquiry with respect to whether a declarant is "excited" or still under the influence of the event is to preclude any chance of fabrication, intervening influences, or the exercise of choice or judgment. *Johnston*, 76 Wn.2d at 406. Washington case law does not require any particular indicia of distress. Indeed, shock is as likely a reaction to a traumatic experience as is hysteria.

[5]Officer Sarver testified that he spoke with Cedrika at about 8:20 p.m., approximately half an hour after 911 was first called and about 10 minutes after he arrived at the scene. He further stated that Cedrika had an ability to communicate a clear verbal picture of what she had seen in the immediate past, unusual in a 3-year-old, and that he understood her right away. He also indicated that when he first spoke with Cedrika, Bryant was not yet a suspect, further reducing the likelihood that her initial statements were made in response to leading or suggestive questions.

circumstances, the trial court properly permitted witnesses to testify as to the content of Cedrika's statements under the excited utterance exception to the hearsay rule.[6]

■ The parties stipulated that Cedrika, at the age of 3 years, was not competent to testify.[7] This stipulation does not make her statements inadmissible. A child's statements will not be excluded on the basis of her incompetence to testify when they otherwise qualify for admission under the excited utterance exception to the hearsay rule. *State v. Bouchard*, 31 Wn. App. 381, 383, 639 P.2d 761, *review denied*, 97 Wn.2d 1021 (1982); *State v. Bloomstrom*, 12 Wn. App. 416, 418-19, 529 P.2d 1124 (1974), *review denied*, 85 Wn.2d 1009 (1975). While this aspect of the rule has been

---

[6]Bryant also argues on appeal that, even if Cedrika's statements were admissible through Anjanette Haines' testimony, admission of testimony by her sister, Patricia, Officer Sarver and Detective Mullinax was improper, cumulative and prejudicial. This argument is again without merit. While a trial court ruling on an objection that the evidence was cumulative would be reviewable for abuse of its discretion, *State v. Martinez*, 53 Wn. App. 709, 717, 770 P.2d 646, *review denied*, 112 Wn.2d 1026 (1989), no objection was made to the testimony at trial on the basis that it was cumulative. Objections to the admission of evidence will not be considered for the first time on appeal unless based upon the same ground asserted at trial. *Stevens*, 58 Wn. App. at 485-86.

Nor were Cedrika's statements particularly prejudicial since they added relatively little to the State's case. The independent evidence concerning the nature of the victim's injuries, the blood and hair in the dent in the wall, the neighbors' testimony that they had heard yelling and banging from the apartment all day, and defendant's own admission that he had hit the victim prove that he did in fact hit her and produce a strong inference that he also hit the victim's head against the wall.

[7]RCW 5.60.050 provides that persons not competent to testify include children under 10 years of age who appear incapable of receiving "just impressions of the facts, respecting which they are examined, or of relating them truly." The factors to be considered in determining the competency of a young child have been described as follows:

(1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.

*State v. Allen*, 70 Wn.2d 690, 692, 424 P.2d 1021 (1967).

criticized by some commentators on the basis that, if a child is not competent as a witness, other statements made by the child are also not competent,[8] the latter conclusion does not necessarily follow from the first. Such criticism fails to distinguish between the ability to perceive and react to an event contemporaneously with its occurrence, and the ability to retain an independent recollection of the event and recount it at a much later time. A child of 3 years may have the capacity to accurately perceive and make a statement about an event within the range of her immediate experience and yet lack the skill to recall these experiences at will at a later time and to express them verbally in a way that is meaningful to others.[9]

By the same token, Cedrika's references to "Freddy Kruger" and "sticks reaching the sky", which were before the jury as well, do not suggest that she was an unreliable witness. Bryant concedes that Cedrika's statement was not fabricated. The jury was aware of the context in which the

---

[8]*See State v. Lounsbery*, 74 Wn.2d 659, 661, 445 P.2d 1017 (1968); R. Aronson, *Evidence in Washington* 803-33 (1991) ("[A] child who is unable to accurately perceive or relate events does not become more capable because the statement was blurted out or was in response to a shocking event."). *But see* 2 C. Torcia, *Wharton on Criminal Evidence* § 292 (14th ed. 1986) (the declaration derives credibility from the strength of the circumstances surrounding its making, not from the competency of the person making the declaration).

[9]*See* Christiansen, *The Testimony of Child Witnesses: Fact, Fantasy, and the Influence of Pretrial Interviews*, 62 Wash. L. Rev. 705 (1987):

A child between the ages of two and four, for example, is typically learning to use language as a basic tool of communication. A four year old's story will mix together details his adult listeners find irrelevant with those which form a meaningful part of the tale. The child cannot yet conceptualize in a way that permits her to impose a logical order. . . .

The development of memory fits this pattern. Memory itself is a function of two components: the capacity to take in and retain accurately the images, sounds, and other elements of experience which are the raw material of memory; and the skill to recall these items and express them meaningfully to others. The former is a natural attribute, but the latter is to a significant degree a learned skill.

(Footnotes omitted.) *Christiansen*, at 708-09 (citing J. Piaget, *The Language and Thought of the Child* (1926); Brown, *The Development of Memory: Knowing, Knowing About Knowing, and Knowing How To Know*, 10 Advances in Child Dev. & Behav. 103, 136 (1975)).

statements were made and that they were made by a 3-year-old, whose demeanor was variously described by several witnesses. The jury was free to give Cedrika's statements the weight it deemed appropriate. There was also substantial other evidence before the jurors on which they could have based their conclusion as to the defendant's guilt.

■ Finally, Bryant argues that his constitutional right to confront the witnesses against him was violated by his being denied the opportunity to cross-examine Cedrika. Bryant's argument is premised on his theory that those statements were not admissible under the excited utterance exception. Because those statements were admissible under this exception, his argument fails. Excited utterances are among the "firmly rooted" exceptions to the hearsay rule that satisfy the confrontation clause of the Sixth Amendment. *Idaho v. Wright*, 497 U.S. 805, 816, 111 L. Ed. 2d 638, 653, 110 S. Ct. 3139, 3149 (1990).

## II
### DEFECTS IN THE INFORMATION

Bryant also contends that the information charging him with second degree felony murder was constitutionally defective for failing to specify the prong of the statute on which the underlying charge of first degree assault was based.[10] The information reads in pertinent part:

> That the defendant Leander Bryant in King County, Washington, on or about March 9, 1990 while committing and attempting to commit the crime of assault in the first degree and in the course of and in furtherance of said crime and in immediate flight therefrom, did cause the death on or about March 11, 1990 of Doris J. Bryant, a human being who was not a participant in the crime;
> Contrary to RCW 9A.32.050(1)(b), and against the peace and dignity of the state of Washington.

---

[10]RCW 9A.36.011(1) provides:

"A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm:

"(a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death; or

"(b) Administers to or causes to be taken by another, poison or any other destructive or noxious substance; or

"(c) Assaults another and inflicts great bodily harm."

An information sufficiently charges a crime if it apprises accused persons of the accusations against them with reasonable certainty. *State v. Leach*, 113 Wn.2d 679, 695, 782 P.2d 552 (1989). The focus is whether all essential elements of an alleged crime have been included in the charging document. *State v. Kjorsvik*, 117 Wn.2d 93, 102, 812 P.2d 86 (1991). The State agrees that the specific felony underlying a charge of felony murder is an essential element of the crime of felony murder, but argues that it was not required to elect one or more of the alternate ways in which the crime of first degree assault can be committed and include it in the charging document. While the underlying crime is an element of felony murder,[11] the defendant is not actually charged with the underlying crime. *State v. Whitfield*, 129 Wash. 134, 139, 224 P. 559 (1924). Rather, the underlying crime functions as a substitute for the mental state the State would otherwise be required to prove. *State v. Craig*, 82 Wn.2d 777, 781-82, 514 P.2d 151 (1973). Washington courts have long held that the elements of the underlying felony are not elements of the crime of felony murder. *State v. Anderson*, 10 Wn.2d 167, 180, 116 P.2d 346 (1941); *State v. Ryan*, 192 Wash. 160, 164-65, 73 P.2d 735 (1937); *State v. Fillpot*, 51 Wash. 223, 228, 98 P. 659 (1908). If the elements of the underlying felony need not be pleaded, it follows, a fortiori, that it is also not necessary to specify in the information the alternative means on which the State will rely to prove the underlying felony. Recent cases addressing the sufficiency of an information do not change the rule or the analysis.[12]

---

[11]At trial the State must prove the elements of the underlying felony beyond a reasonable doubt. *State v. Quillin*, 49 Wn. App. 155, 164, 741 P.2d 589 (1987), *review denied*, 109 Wn.2d 1027 (1988).

[12]This conclusion is further supported by the recent holding in *State v. Noltie*, 116 Wn.2d 831, 842, 809 P.2d 190 (1991) (citing *State v. Elliott*, 114 Wn.2d 6, 13, 785 P.2d 440, *cert. denied*, 498 U.S. 838 (1990)) that, with respect to the primary crime charged, the prosecution need not elect between alternative means of committing an offense in an information. *Kreck v. Spalding*, 721 F.2d 1229, 1232 (9th Cir. 1983), on which Bryant would have us rely for his position that an information that fails to elect an alternative means is insufficient, was decided prior to and conflicts with these cases and does not control.

If the alternative means by which the underlying felony was committed are not elements of the crime and need not be included in the information, we do not have to analyze the sufficiency of the information at all. However, such an analysis yields the same result. Where, as here, the sufficiency of the information is challenged for the first time on appeal, a rule of liberal construction applies. *Kjorsvik*, 117 Wn.2d at 102. The 2-prong analysis adopted in *Kjorsvik* looks first to whether the necessary facts appear in any form on the face of the document or can be fairly construed therein,[13] and, if so, whether the accused actually received notice of the charges against which he had to defend or whether he sustained any prejudice. 117 Wn.2d at 105-06. Applying the *Kjorsvik* analysis to the information here leads to the conclusion that the information was sufficient to apprise Bryant of exactly what the charges were. It is difficult to conceive of a manner in which Bryant could have misunderstood that the information charged him with assaulting his wife in a manner that caused her death. That is precisely what it says.[14] Nor was Bryant prejudiced as

---

[13]As noted by the court in *Kjorsvik*,

> the question . . . is whether all the words used would reasonably apprise an accused of the elements of the crime charged. Words in a charging document are read as a whole, construed according to common sense, and include facts which are necessarily implied.
>
> . . . This inquiry turns on the elements of the particular crime charged and the meaning to be derived from the language of the charging document.

117 Wn.2d at 109. The *Kjorsvik* court also cited with approval the following observation of a prominent commentator in this field:

> The fundamental purpose of the pleading is to inform the defendant of the charge so that he may prepare his defense, and the test for sufficiency ought to be whether it is fair to defendant to require him to defend on the basis of the charge as stated in the particular indictment or information. *The stated requirement that every ingredient or essential element of the offense should be alleged must be read in the light of the fairness test just suggested.*

117 Wn.2d at 109 (quoting 1 C. Wright, *Federal Practice* § 125, at 365-66 (2d ed. 1982)).

[14]If Bryant believed that the information did not adequately apprise him of the crime with which he was charged, he could have sought clarification by requesting a bill of particulars. *See State v. Holt*, 104 Wn.2d 315, 320, 704 P.2d 1189 (1985) (requiring a defendant to request a bill of particulars in order to preserve such a challenge on appeal). Bryant made no such request.

a result of any purported inadequacy in the charging document.[15] Bryant's defense was that, while he hit his wife, it was not hard enough to cause serious bodily injury or death. That is the precise means under the assault statute with which he was charged. There is no reasonable basis for concluding that Bryant was not adequately apprised of the charges against which he would have to defend. The information at issue here was not constitutionally defective.

Affirmed.

SCHOLFIELD and PEKELIS, JJ., concur.

---

[15] At this juncture in the *Kjorsvik* test we look to the certification for determination of probable cause as well as the information. 117 Wn.2d at 111. The certification for determination of probable cause alleged facts supporting two of the three prongs of the first degree assault statute; the third, poisoning, was clearly not invoked. Factual allegations in the certification for determination of probable cause included the following:

Doris J. Bryant [was found] in the bathtub, unconscious. She was bleeding from her head and appeared to have been beaten. Clumps of her hair were found in the bathroom and on the bedroom floor. . . .

Various neighbors reported hearing a fight inside the apartment and repeated bumping sounds throughout the evening. . . . The defendant admitted to one neighbor that they had been fighting and arguing all day. Their three year old granddaughter, Cedrica [sic], stated, "Grandpa was hitting grandma," and "Grandma had blood on her". Cedrica [sic] was the only other person inside the apartment during the fight. She indicated to the police that the defendant had used some type of metal object to hit Ms. Bryant with and that he had also hit her against the walls.

. . . Ms. Bryant died on March 11, 1990 and an autopsy revealed numerous head injuries including a right subdural hematoma.