IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 85622-7-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| THOMAS ALFRED DONAGHE, | UNPUBLISHED OPINION |
| Appellant. | |

SMITH, J. — In October 2021, Thomas Donaghe called 911 to report tools stolen out of his work truck. Complaining to friends about the theft, Donaghe stated he would wait for the thieves to return. Later that night, Donaghe shot and killed Tyler Raymond, who had been stealing from his truck. The State charged Donaghe with first degree premediated murder and second degree murder with a special allegation that he was armed with a firearm. The jury convicted Donaghe of second degree murder while armed with a firearm but acquitted him of premeditated murder.

Donaghe appeals, arguing (1) the trial court violated his right to present a defense, (2) the jury instructions were improper, (3) the charging document was constitutionally deficient, (4) his sentence violated due process, and (5) his judgment and sentence was inaccurate. We affirm Donaghe's conviction, but remand the case to correct the scrivener's error in the judgment and sentence.

FACTS

BACKGROUND

In 2021, Thomas Donaghe was in his late 70's and lived in a motorhome in the Interbay neighborhood of Seattle. Donaghe was a former welder and stored many of his work tools in one of his trucks, which he kept parked in a nearby lot. On October 29, 2021, Donaghe called 911 to report that most of his tools had been stolen from his work truck. Seattle Police Department (SPD) officers took a report and advised Donaghe to call them if someone went on the property again. In response, Donaghe told the officers, if they come back, they should bring an "ME" (medical examiner) with them.

That same day, Donaghe texted a friend and told her about the theft. He said he was going to wait for the thieves that night. A few hours later, he texted her again and said, "I had to go get a rifle. I'm going to go on a []¹ hunt." Donaghe called another friend, Holton Miller, who later spoke with SPD detectives and told them Donaghe said he was planning on going back to his truck that night to "watch and see if anybody comes back to try and steal." Donaghe told Miller that he was going to "run the person off."

Around 3:30 a.m. on October 30, a woman—later identified as Shanna Huntington—flagged down police officers near the parking lot where Donaghe kept his work truck parked. The woman directed the officers to the parking lot and told them she thought her boyfriend had overdosed. The officers found Tyler

---

¹ In his messages, Donaghe misspelled a derogatory racial epithet most often used against Black people.

Raymond unconscious on the ground, lying about 70 feet from Donaghe's truck. The officers performed CPR on Raymond until the fire department arrived, which is when they discovered Raymond had been fatally shot. A toxicology report later revealed that Raymond had drugs in his system at the time of his death.

Two days later, SPD detectives interviewed Donaghe concerning the incident in the parking lot. Donaghe denied having any involvement with the shooting and claimed he never went back to his truck after his initial meeting with SPD officers to report the theft. Donaghe consented to SPD searching his phone. Contrary to Donaghe's statements, his phone data indicated he had been in the parking lot near his truck at the time of the shooting.

Donaghe's phone records also revealed he called Miller the morning of the shooting. In an interview with SPD detectives a few days after the incident, Miller said Donaghe had told him, "This guy's done. I caught him. He's done and I killed him. I shot him." In a subsequent interview with SPD in January 2023, Miller claimed he did not mean to say Donaghe killed the guy, and he had blurted it out without realizing the meaning of it. At trial, when asked if he remembered telling SPD Donaghe shot the man, Miller said, "I don't know. I just – a lot of stress. . . . I mean, I see it on the paper." Miller also testified his memory was better closer to when the event happened than at trial.

A few weeks after the incident, Donaghe went to SPD for another interview. For nearly two hours Donaghe denied having any involvement in Raymond's death. Then, after detectives informed Donaghe that his cell phone records placed him in the parking lot at the time of the shooting and asked

3

Donaghe, "What the hell happened?" Donaghe replied, "The guy threatened to kill me, that's what happened." Donaghe claimed Raymond threatened him, saying, "I can take anything you got all the time and you can't do a fucking thing about it." Donaghe described the event, explaining he saw Raymond near his truck and asked what he was doing. Raymond said, "Nothing" and started walking away. Donaghe "hollered hey at him or something" and Raymond turned around and started walking toward Donaghe. Donaghe told SPD detectives Raymond was walking toward him and holding something, but Donaghe was not able to describe the object in Raymond's hands. Donaghe said Raymond was about 10 feet away when he shot him. Donaghe claimed he threw the pistol into the Puget Sound after the shooting.

SPD arrested Donaghe charged him with first degree murder and second degree murder with second degree assault as the predicate felony. The information did not explicitly name the elements of or type of second degree assault.

TRIAL

Before trial began, the State moved to exclude the toxicology report showing Raymond had drugs in his system at the time of the shooting, as well as any statements made by Huntington to SPD detectives about Raymond's drug use. Donaghe opposed this motion, claiming Raymond's drug use was relevant to his motive. The court noted the evidence was speculative as to Raymond's motive and was irrelevant because Raymond stealing was not disputed, and Donaghe had no knowledge of Raymond's drug use at the time. In addition, the

4

court noted "the probative value of . . . Raymond's drug use, even if you found it relevant somehow, . . . is extremely small. The prejudicial impact of the drug use is very high." The court granted the State's motion to exclude the evidence.

At the end of trial, Donaghe proposed jury instructions for justifiable homicide patterned after Washington Pattern Jury Instruction: Criminal (WPIC) 16.02 (Justifiable Homicide—Defense of Self and Others). His proposed instructions included the bracketed language "to commit a felony" and "to inflict death or great personal injury."[2] Donaghe also proposed jury instructions defining robbery, attempted robbery, and felony to "make it clear to the jury that [justifiable homicide] doesn't apply to theft, it only applies to robbery." The State opposed the inclusion of "to commit a felony," claiming sufficient evidence did not exist to support a finding Raymond committed a violent felony—a required element for justifiable homicide. Ultimately, the court declined to include "to commit a felony," noting it would "heighten the State's burden and eliminate the need for there to be any issue as to whether or not [] Donaghe believed that his life was in danger or he was going to suffer great bodily harm" as a result of an attempted robbery. The court reasoned Donaghe could still argue his theory of

---

[2] WPIC 16.02 directs the bracketed material should be used as applicable in each case. The instruction reads, in pertinent part:

Homicide is justifiable when committed in the lawful defense of [the slayer] . . . when:

(1) the slayer reasonably believed that the person slain [or others whom the defendant reasonably believed were acting in concert with the person slain] intended [to commit a felony] [to inflict death or great personal injury].

self-defense without the "to commit a felony" language. The jury found Donaghe guilty of murder in the second degree based on second degree assault.

At sentencing, the State proposed a sentence of 232 months, including 60 months for the firearm enhancement, which was within the standard range.[3] Donaghe requested an exceptional sentence downward based on mitigating circumstances. Donaghe cited two statutory mitigating factors: (1) "[t]o a significant degree, the victim was an initiator, willing participant, aggressor, or provoker of the incident," and (2) "[t]he defendant committed the crime under duress, coercion, threat, or compulsion insufficient to constitute a complete defense but which significantly affected his or her conduct."[4]

The court did not find Donaghe's request for an exceptional sentence downward compelling. The court concluded it did not find any of the mitigating circumstances Donaghe presented to be true. The court noted, "The jurors did not find [Donaghe] guilty of murder 1, but I thought there was ample evidence to support it." The court agreed with the State's proposal and sentenced Donaghe to 232 months. Donaghe appeals.

ANALYSIS

Excluded Evidence

Donaghe claims the trial court abused its discretion and violated his right to present a defense by excluding evidence concerning Raymond's drug use.

---

[3] The standard range for Donaghe, who had an offender score of 0 on a seriousness level of 14, was 123–220 months, pus 60 months enhancement for the firearm.

[4] RCW 9.94A.535(1)(a), (c).

Because the evidence's prejudicial nature outweighed any probative value, the trial court properly excluded the evidence.

### 1. Evidentiary Ruling

Evidentiary rulings are reviewed for an abuse of discretion. *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019). A trial court abuses its discretion if " 'no reasonable person would take the view adopted by the trial court.' " *State v. Jennings,* 199 Wn.2d 53, 59, 502 P.3d 1255 (2022) (quoting *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)). Whether the exclusion of evidence violated a defendant's Sixth Amendment right is a legal question reviewed de novo. *State v. Orn*, 197 Wn.2d 343, 350, 482 P.3d 913 (2021).

All relevant evidence is admissible, except as limited by the constitution, statute, rules of evidence, or other applicable rules. ER 402. Relevant evidence is evidence that has the tendency "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Evidence concerning motive may be admissible, but its probative value must be weighed against potential prejudice. *See State v. Matthews*, 75 Wn. App. 278, 283-84, 877 P.2d 252 (1994).

Evidence may also be relevant under the doctrine of res gestae. The res gestae doctrine recognizes evidence may be admissible if it aids in " 'complet[ing] the story of the crime on trial by proving its immediate context of happenings near in time and place.' " *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995) (internal quotation marks omitted) (quoting *State v. Tharp*, 27

7

Wn. App 198, 204, 616 P.2d 693 (1980)). When the defendant presents a self-defense claim, evidence may be relevant under res gestae to show a "continuing course of provocative conduct" by the aggressor. *Lane*, 125 Wn.2d at 833. The probative value of evidence relevant under the res gestae doctrine must still be weighed against potential prejudice.

Here, Donaghe contends Raymond's toxicology report and testimony about Raymond's drug use were relevant to show Raymond's motive and were admissible under the doctrine of res gestae. Donaghe claims evidence of Raymond's drug use explains why Raymond was stealing his property—to support his habit—and the evidence makes it more probable that Raymond threatened Donaghe, thus corroborating Donaghe's version of events and theory of self-defense.

The State claims the evidence is not relevant because "[i]nformation about the victim is not relevant to a claim of self-defense unless it was known to the defendant at the time he used force against the victim." The State relies heavily on *Jennings*, to support their assertion.

In *Jennings*, the defendant was charged with intentional and felony murder of Chris Burton. 199 Wn.2d at 55. Jennings sought to introduce a toxicology report showing Burton had a high level of methamphetamine in his system at the time of his death. *Id.* at 57. Jennings claimed the toxicology report corroborated his observation that Burton was high on drugs at the time of the shooting. *Id.* Jennings said the evidence was relevant to his self-defense theory because he reasonably believed Burton was high at the time of the incident and, in his

experience, people in that state are erratic, aggressive, and violent. *Id.* at 61. The State argued this fact was irrelevant because it was only discovered after Burton's death and, therefore, had no impact on Jennings' beliefs when he killed Burton. *Id.* at 62.

The court in *Jennings* found that, while Jennings made a "plausible argument that the toxicology report here was at least minimally relevant," the State's argument that the toxicology report was speculative was also reasonable. *Id.* at 62. The court held the trial court did not abuse its discretion in excluding the report because "reasonable minds might differ" as to the relevance of the report where "Jennings offered no witness to testify as to the potential effects on the victim or that he had previously observed the victim under the influence of methamphetamine." *Id.* at 62-63.

Donaghe claims *Jennings* is not analogous because Jennings sought to admit the evidence to corroborate his beliefs about the victim at the time of the shooting, whereas Donaghe sought to admit the evidence for purposes of motive and res gestae. This argument is unpersuasive. First, the court recognized Raymond's motive had no bearing on Donaghe's actions at the time of the shooting. Donaghe never indicated in his interviews that he believed Raymond was using drugs at the time of the shooting, therefore, this fact is irrelevant to Donaghe's perspective or actions during the incident. As the trial court noted, "[I]n *Jennings*, the only way the Supreme Court said [the evidence] was minimally relevant—because the stated purpose for introducing the report was to corroborate his own observation." Furthermore, that Raymond was committing

9

theft was not contested, and the reasons for committing the crime are irrelevant. Whether Raymond was stealing to aid his drug addiction, to make money by selling the items, or for the thrill of it makes no difference. Even if motive was relevant, Donaghe offered no evidence to establish drug use is what drove Raymond's behavior.

For these same reasons, the doctrine of res gestae is inapplicable. Donaghe contends evidence of Raymond's drug use "was relevant to rebut the notion that the decedent was clear-headed, sober, and acting rationally at the time of the confrontation," and helped complete the picture of what happened during the incident. But Donaghe never indicated Raymond was acting irrationally, and he had no knowledge of Raymond's drug use at the time of the incident. Donaghe also did not produce evidence that Raymond's drug use contributed to the theft—any connection was speculative. Because evidence of Raymond's drug use did not provide context for either Donaghe or Raymond's behavior, it was not relevant under the doctrine of res gestae.

Any evidence that Raymond had drugs in his system at the time of his death was not relevant, and the court did not abuse its discretion in excluding the evidence.

2. <u>Right to Present a Defense</u>

A defendant has a constitutional right to present a defense. *Orn*, 197 Wn.2d at 352; U.S. CONST. amend. VI; CONST. art I, § 22. When a defendant claims the trial court violated their right to present a defense, this court engages in a two-step review process. *Arndt*, 194 Wn.2d at 797. First, we review the trial

court's evidentiary ruling for abuse of discretion. *Jennings,* 199 Wn.2d at 58. Second, if the trial court did not abuse its discretion, we consider whether the exclusion of evidence nonetheless violated the defendant's right to present a defense. *Jennings*, 199 Wn.2d at 58.

To determine whether the exclusion of evidence violated a defendant's right to present a defense, the court weighs the evidence's probative value against its prejudicial nature. *Jennings*, 199 Wn.2d at 64. The greater the probative value of evidence, the more likely its exclusion is a constitutional violation. *State v. Hudlow*, 99 Wn.2d 1, 15, 659 P.2d 514 (1983). Evidence that constitutes a defendant's entire defense is highly probative. *Jennings*, 199 Wn.2d at 65. Conversely, evidence that may "disrupt the fairness of the fact-finding process" is considered highly prejudicial. *Hudlow*, 99 Wn.2d at 15. In balancing competing interests, a court distinguishes "between evidence that merely bolsters credibility and evidence that is necessary to present a defense." *Jennings*, 199 Wn.2d at 66-67.

Donaghe contends the evidence was not unfairly prejudicial to the State and it was critical to his self-defense claim. He maintains the excluded evidence was the only evidence that provided an explanation to the jury of why Raymond was so motivated to steal and threaten him and, as such, it was central to his argument of self-defense. Donaghe also alleges the probative value of the evidence outweighed any prejudice, and any risk of unfair prejudice could have been cured through a limiting instruction.

11

The State maintains the prejudicial nature of the evidence substantially outweighs any probative value, and excluding evidence bearing on Raymond's motive did not prevent Donaghe from presenting a full defense. The State again relies on *Jennings* to support its claims.

As discussed above, evidence about Raymond's drug use was not relevant to his motive, but even if it were minimally relevant, its probative value was outweighed by the State's interest in precluding unfair prejudice. First, the excluded evidence did not constitute Donaghe's entire defense. Donaghe was not prevented from arguing that Raymond was stealing or that Raymond allegedly taunted Donaghe and threatened to kill him. Additionally, the evidence that Raymond used drugs would have been highly prejudicial. Similar to *Jennings*, the evidence could have led the jury to make "prejudicial inferences, unsupported by the evidence, about the victim's actions given his intoxication level." 199 Wn.2d at 66. Evidence of drug use could have invoked stereotypes about drug users as violent, aggressive, or criminal in nature.

Because the evidence was highly prejudicial and was not necessary for Donaghe to present his claim of self-defense, Donaghe's constitutional right to present a defense was not violated.

<u>Jury Instructions</u>

Donaghe contends the jury instructions on self-defense were incomplete because they did not include "to commit a felony." Because the evidence does not support a finding that a violent felony was being committed, and the

12

instructions provided allowed Donaghe to argue his theory, the instructions were sufficient.

We review challenged jury instructions de novo. *State v. Harris*, 164 Wn. App. 377, 383, 263 P.3d 1276 (2011). Each instruction must be examined in the context of the instructions as a whole. *State v. Sublett*, 176 Wn.2d 58, 78, 292 P.3d 715 (2012). Jury instructions are sufficient if they permit the defendant to "argue their theory of the case, are not misleading, and, when read as a whole, properly inform the trier of fact of the applicable law." *Harris*, 164 Wn. App. at 383. If a jury instruction is duplicative, it is not error for the court to omit the repetitive instruction. *State v. Brenner*, 53 Wn. App. 367, 377, 768 P.2d 509 (1989), *overruled on other grounds by State v. Wentz*, 149 Wn.2d 342, 68 P.3d 282 (2003).

In a murder prosecution, if a defendant produces some credible evidence "to establish that the killing occurred in circumstances that meet the requirements of RCW 9A.16.050," the defendant is entitled to a jury instruction on justifiable homicide. *State v. Brightman*, 155 Wn.2d 506, 520, 122 P.3d 150 (2005). Under RCW 9A.16.050, a homicide is justifiable when committed either:

> (1) [i]n the lawful defense of the slayer . . . when there is reasonable ground to apprehend a design on the party of the person slain to commit a felony or to do some great personal injury to the slayer . . . , and there is imminent danger of such design being accomplished; or (2) [i]n the actual resistance of an attempt to commit a felony upon the slayer, in his or her presence.

13

An instruction on justifiable homicide is only available to a defendant when their use of force was objectively reasonable under the circumstances. *Brightman*, 155 Wn.2d at 521.

To determine whether an instruction under RCW 9A.16.050 is appropriate, the court applies a subjective and objective test. *Brightman*, 155 Wn.2d at 520. This test requires the court to determine "whether the defendant produced any evidence to support the claim he or she subjectively believed in good faith that he or she was in imminent danger of great bodily harm and whether this belief, viewed objectively, was reasonable." *State v. Read*, 147 Wn.2d 238, 243, 53 P.3d 26 (2002). The evidence must be viewed in the light most favorable to the defendant. *State v. George,* 161 Wn. App. 86, 95-96, 249 P.3d 202 (2011). If a defendant produces some credible evidence, the burden shifts to the State to prove absence of self-defense beyond a reasonable doubt. *Brightman*, 155 Wn.2d at 520.

When a court refuses a defendant's instruction on self-defense, the standard of review depends on why the court refused the instruction. *Read*, 147 Wn.2d at 243. If the trial court found "no evidence supporting the defendant's subjective belief of imminent danger of great bodily harm, an issue of fact, the standard of review is abuse of discretion." *Read*, 147 Wn.2d at 243. If the trial court found that "no reasonable person in the defendant's shoes would have acted as the defendant acted, an issue of law, the standard of review is de novo." *Read*, 147 Wn.2d at 243.

Here, Donaghe contends the court erred when it did not include the bracketed language "to commit a felony" in the jury instruction for self-defense. Donaghe claims he produced evidence to support his claim that Raymond was committing a felony (robbery) and the language should have been included. Donaghe admits that not every robbery warrants the use of deadly force, but contends Raymond's threat to kill him and advancement toward him permitted the use of deadly force and, accordingly, the court should have included "to commit a felony" in the jury instructions.

Despite admitting not all robberies warrant the use of deadly force, Donaghe also alleges that because Raymond was committing a felony, he did not have to reasonably fear great personal injury or death before using deadly force, he only needed to show a robbery, which presumptively endangered his person, occurred. Donaghe claims requiring the threat of great personal injury or death when a felony is being committed renders the language "to commit a felony" in RCW 9A.16.050(1) meaningless. Donaghe states the two prongs of RCW 9A.16.050(1) must be analyzed separately. But, even analyzing the two prongs separately, Donaghe's argument fails.

First, the court did not err when it refused to give the "to commit a felony" instruction because the evidence did not support a finding that a felony was being committed. Even viewed in the light most favorable to Donaghe, no reasonable person could find the facts support Donaghe's contention that Raymond was committing a felony when Donaghe shot him. Raymond was clearly committing a theft when Donaghe first approached him, but as soon as

Donaghe asked what Raymond was doing, Raymond walked away. Raymond only turned around and started walking toward Donaghe after he yelled at Raymond.

Even assuming Raymond's actions can be viewed as the "use or threatened use of immediate force, violence, or fear of injury," they did not occur during the commission of a robbery and, therefore, no felony occurred. *See State v. Johnson*, 155 Wn.2d 609, 611, 121 P.3d 91 (2005) ("[T]he force must relate to the taking or retention of the property, either as force used directly in the taking or retention or as force used to prevent or overcome resistance 'to the taking.' " (quoting RCW 9A.56.190)). In *Johnson*, the defendant stole a shopping cart from a store, but when security guards approached him, he abandoned the cart and started to run away. 155 Wn.2d at 609. Johnson then turned back and punched one of the guards. *Id.* The court held Johnson was not attempting to retain the property when he punched the guard and, accordingly, he did not commit a felony. *Id.* Similarly, here, Raymond abandoned any attempt to take the arc welder by the time he turned around and started walking toward Donaghe; therefore, a violent felony was not committed and Donaghe was not legally permitted to use deadly force.

Second, Donaghe would not be justified in using deadly force unless he reasonably believed Raymond intended to inflict death or great personal injury. Donaghe is incorrect in stating, "[R]easonable fear of a lesser injury by a commission of a felony, i.e., robbery, also would have warranted a jury's conclusion that [his] 'use of deadly force was necessary under the

16

circumstances.' " (Emphasis omitted.)  Washington courts have made clear that risk of injury is not enough: "[A] killing in self-defense is not justified unless the attack on the defendant's person threatens life or great bodily harm."  *State v. Griffith*, 91 Wn.2d 572, 576, 589 P.2d 799 (1979).

Finally, even without the "to commit a felony" language, the jury instructions allowed Donaghe to argue his theory.  Donaghe's defense was that he reasonably believed he was in peril when Raymond started walking toward him.  Under the instructions provided, "homicide is justifiable when committed in the lawful defense of the slayer when **. . .** the slayer reasonably believed that the person slain intended to inflict death or great personal injury."  This instruction allowed Donaghe to argue his actions were in response to a threat of great personal injury or death.  Including the instructions for justifiable homicide in resistance to a felony would have been repetitious.

In *State v. Boisselle*, 3 Wn. App. 2d. 266, 415 P.3d 621 (2018), *reversed on other grounds*, 194 Wn.2d 1 (2019), the court encountered a similar situation. In that case, the defendant proposed jury instructions on justifiable homicide, both in defense of self and in resistance to a felony.  *Boisselle,* 3 Wn. App. 2d at 288.  The trial court found no evidence existed to support the defense of justifiable homicide in resistance of a felony and declined to give the instruction. *Id.* at 290.  The trial court noted, " '[D]efense of self and defense in resistance to a felony are closely related, as every person who defends being attacked is resisting the commission of a felony assault.' "  *Id.*  This court affirmed, stating, "Because Boisselle was already arguing that he was resisting death or great

17

bodily harm when he killed the victim, his proposed instruction would have been repetitious." *Id.* at 291. For the same reason, Donaghe's proposed "to commit a felony" language would have been repetitious, and the trial court did not err in declining to include the instruction.

Because the evidence does not support a finding that a violent felony was being committed, and the instructions provided allowed Donaghe to argue his theory, the trial court did not err when it declined to include the "to commit a felony" language.

Charging Document

Donaghe contends the charging document was constitutionally defective because it did not contain the elements of second degree assault, the predicate offense of his second degree murder charge. Because a charging document does not need to include the elements of a predicate offense, the charging document was not defective.

This court reviews challenges to the sufficiency of a charging document de novo. *State v. Rivas*, 168 Wn. App. 882, 887, 278 P.3d 686 (2012). An accused person has a constitutional right to be informed of the charges against them. *Rivas*, 168 Wn. App. at 887. Accordingly, a charging document must include all essential elements of a crime to "give notice to an accused of the nature of the crime that he or she must be prepared to defend against." *State v. Kjorsvik*, 117 Wn.2d 93, 101, 812 P.2d 86, 90 (1991).

When a charging document is challenged for the first time on appeal, the court adopts a more liberal standard of review. *Kjorsvik*, 117 Wn.2d at 102. This

18

standard is applied as a two-prong test: "(1) do the necessary facts appear in any form, or by fair construction can they be found, in the charging document; and, if so, (2) can the defendant show that he or she was nonetheless actually prejudiced by the inartful language which caused a lack of notice?" *Kjorsvik*, 117 Wn.2d at 105-06. If the charging document, when read "as a whole and in a common sense manner" informs the defendant of the charges against them, it is sufficient, even if it does not include an essential element. *Kjorsvik*, 117 Wn.2d at 110-11. If a court reaches the second prong of the test, it may look to the statement of probable cause to determine whether the inartful language caused prejudice. *State v. Pry*, 194 Wn.2d 745, 753, 452 P.3d 536 (2019).

When a State charges a defendant with felony murder, the predicate felony is an element of the charge, but the defendant is not actually charged with the underlying crime. *State v. Kosewicz*, 174 Wn.2d 683, 691-92, 278 P.3d 184 (2012). Accordingly, "Washington courts have long held that the underlying elements of the predicate felony are not essential elements of felony murder and do not have to be included in the information." *Kosewicz*, 117 Wn.2d at 691-92. Additionally, "because the elements of the predicate felony need not be pleaded, the information also does not need to specify the alternative means of committing a crime on which the State will ultimately rely." *Kosewicz*, 117 Wn.2d at 692.

Here, Donaghe contends the information was insufficient because it did not list the elements of the predicate offense (assault in the second degree) and it failed to identify what method of second degree assault the State was alleging.

19

Donaghe acknowledges that Washington law does not support his assertion, but claims, "Those cases are wrongly decided and should not be followed."

Donaghe mainly rests his argument on the dissent in *Kosewicz* and *Kreck v. Spalding*, 721 F.2d 1229, 1233 (9th Cir. 1983). In *Kosewicz*, Justice Chambers, dissenting in part, disagreed with the majority that the elements of a predicate felony need not be included in the information and said this rule relies on "principles long abandoned by this court." 117 Wn.2d at 701. In *Kreck*, the Court, interpreting Washington State law, concluded the information was insufficient because it failed to specify which subsection of the second degree assault statute the defendant violated. 721 F.2d at 1233.

But the conclusion in *Kreck* was not adopted by subsequent Washington cases. *See Kosewicz*, 117 Wn.2d at 691-92 ("[T]he underlying elements of the predicate felony are not essential elements of felony murder and do not have to be included in the information."); *State v. Bryant*, 65 Wn. App. 428, 438 n.12, 828 P.2d 1121 (1992) (noting *Kreck* is not controlling); *State v. Hartz*, 65 Wn. App. 351, 355, 828 P.2d 618 (1992) ("The holding in *Kreck v. Spalding* that an information that fails to elect an alternative means is constitutionally deficient is unpersuasive."). Accordingly, *Kreck* is not controlling and this court must follow Washington State Supreme Court precedent. *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984).

Applying the two-prong standard of review applicable to charging documents first challenged on appeal, the information was sufficient to apprise Donaghe of the charges against him. First, the information properly identified the

predicate felony (second degree assault) underlying the felony murder charge, and the State was not required to include the elements of the predicate offense. Additionally, the State was not required to specify the alternative means on which they relied to prove the underlying felony. But, even so, Donaghe was reasonably apprised of the conduct underlying the second degree assault charge given the shooting was the only assault that occurred. Accordingly, Donaghe cannot show—nor does he argue—he was prejudiced by the alleged inartful language.

Because the information provided Donaghe with sufficient notice of the charges against him, the charging document was not constitutionally defective.

### Sentencing

Donaghe contends the court violated the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, his constitutional right to a fair trial, and due process by basing his sentence on a crime he was not charged for. The State contends the court did not err because it imposed a standard sentence based on the evidence presented at trial and, even if it was improper for the court to opine on its view of the evidence, any error was harmless. We agree with the State.

1. Sentencing Reform Act

The SRA provides, "In determining any sentence other than a sentence above the standard range, the trial court may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing." RCW 9.94A.530. This is known as the "real facts" doctrine. *State v. Elza*, 87 Wn. App. 336, 342, 941 P.2d 728 (1997) ("Under the

21

real facts doctrine, a sentencing court may not impose a sentence based upon the elements of a more serious crime that the State did not charge or prove.") The policy underlying the real facts doctrine "is to limit sentencing decisions to facts that are acknowledged, proven, or pleaded, and to prevent sentencing courts from imposing exceptional sentences when dissatisfied with the jury's verdict." *Elza*, 87 Wn. App. at 342. The doctrine disallows courts from considering uncharged crimes as a reason for imposing an exceptional sentence. *State v. McAlpin*, 108 Wn.2d 458, 466, 740 P.2d 824 (1987). "One of the overriding purposes of the [SRA] is to ensure that sentences are proportionate to the seriousness of the crime committed." *McAlpin*, 108 Wn.2d at 464.

Donaghe contends the court relied on acquitted conduct when it sentenced him and declined to impose an exceptional sentence below the standard range, as he requested. Donaghe bases this assertion on the court's comments during sentencing, where it stated ample evidence supported a finding of premeditated murder. Donaghe claims premeditation was not proved at trial and, therefore, it violates the real facts doctrine to consider such conduct during sentencing. Donaghe mainly relies on *McAlpin* and *Elza* to support his contention. While neither case is directly on point, they are helpful in analyzing the issue.

In *McAlpin*, the court concluded the trial court improperly considered previous, uncharged conduct in imposing an exceptional sentence above the standard range. 108 Wn.2d at 467. In *Elza*, a jury acquitted Elza of felony murder, but convicted him of first degree robbery. 87 Wn. App. at 339. The

court imposed an exceptional sentence, noting as one of its reasons that the victim of the robbery had died. *Id.* On appeal, this court found the trial court abused its discretion in considering the victim's death as an aggravating factor because Elza was acquitted of murder. *Id.* at 343-44.

Unlike *McAlpin* and *Elza*, the trial court here did not rely on acquitted conduct when it declined to find mitigating factors. Concerning the first mitigating factor (the degree to which the victim was the aggressor, willing participant, initiator or provoker), the court noted, "I don't believe any of those things to be true." The court concluded insufficient evidence supported an exceptional sentence under this factor. For the second mitigating factor (the defendant committed the crime under duress, coercion, threat or compulsion), the court stated, "I don't believe that happened." The court relied on SPD's interrogation of Donaghe and Donaghe's own statements in making this determination.

While Donaghe is correct the court discussed its belief Donaghe acted with premeditation, the court did not rely on a conviction of premeditation in determining Donaghe's sentence. The court's sentence adopted the State's recommendation and was within a standard range. The court's comments on premeditation may have been inappropriate, but the court did not violate the SRA in determining Donaghe's sentence.

Because the court did not rely on acquitted conduct at sentencing, Donaghe's sentence did not violate the SRA.

2.  Due Process & Fair Trial

Donaghe contends the trial court violated his constitutional rights to due process and a fair trial when it considered conduct based on acquitted charges during sentencing.  Because we find the trial court did not consider conduct based on acquitted charges when it sentenced Donaghe, his constitutional rights were not violated.

## Judgment & Sentence

Donaghe asserts a scrivener's error in the judgment and sentence, and the State agrees.  We remand with instructions for the court to correct the scrivener's error.

When an error is made on the face of a judgment and sentence, "this court has the authority, as well as the duty" to correct the error.  *State v. Hibdon*, 140 Wn. App. 534, 537, 166 P.3d 826 (2007).  Donaghe was convicted of second degree felony murder under RCW 9A.32.050(1)(b), but the judgment and sentence also included intentional murder, RCW 9A.32.050(1)(a), which Donaghe was not convicted.

Because an error was made in the judgment and both parties agree, it should be corrected.  We remand with instructions for the court to remove intentional murder, RCW 9A.32.050(1)(a), from the judgment and sentence.

Statement of Additional Grounds

In a statement of additional grounds, Donaghe asserts the trial court (1) denied exculpatory evidence in violation of *Brady*,[5] (2) abused its discretion by excluding a critical witness, (3) abused its discretion by denying evidence of Raymond's drug use, and (4) gave unlawful jury instructions. We find all of these arguments unpersuasive.

A defendant may submit a pro se statement of additional grounds under RAP 10.10. We only consider issues raised in that statement of additional grounds if they adequately inform us of the "nature and occurrence of the alleged errors." *State v. Calvin*, 176 Wn. App.1, 26, 316 P.3d 496 (2013); RAP 10.10. We do not consider arguments repeated from the briefing. RAP 10.10(a).

1. Exculpatory Evidence

Donaghe claims the court denied exculpatory evidence by refusing to admit interviews and statements made to SPD, resulting in a *Brady* violation. Because the court properly excluded evidence and *Brady* is not applicable, we disagree with Donaghe's argument.

We review claims of *Brady* violations de novo. *In re Pers. Restraint of Mulamba*, 199 Wn. 2d 488, 498, 508 P.3d 645 (2022). A defendant's due process rights are violated when the State suppresses "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of [] good faith or bath faith." *Brady*, 373 U.S. at 87. A *Brady*

---

[5] *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)

violation analysis has three components: (1) the withheld evidence must be favorable to the accused, (2) the State must have suppressed the evidence, either willfully or inadvertently, and (3) the defendant must have been prejudiced. *Mulamba*, 199 Wn.2d at 498.

Donaghe's argument fails for two reasons. First, Donaghe's argument does not adequately inform the court of the "nature and occurrence of the alleged errors," as required by RAP 10.10. His argument misinterprets the record and fails to demonstrate why the alleged error was a violation of *Brady*. Second, even assuming Donaghe's argument was sufficient to inform the court of the alleged error, no *Brady* violation occurred.

Donaghe appears to contend the court denied exculpatory evidence under *Brady* by not allowing the admission of interviews and statements made to SPD by Austin Shanks[6] and Shanna Huntington. Even if this argument had merit, it would not be a *Brady* violation. For a *Brady* violation to occur, evidence must be withheld by the State. Donaghe provides no argument for how the State withheld evidence from Donaghe. In fact, both Donaghe and the State acknowledged conversations with Shanks and confirmed they had disclosed communications to the other party.

Donaghe cites to a proceeding where the trial court considered motions from both parties concerning the exclusion of statements from Shanks and Huntington. The court granted the State's motion to exclude testimony about

---

[6] Shanks was an acquaintance of Raymond and was alleged to have been involved in trafficking stolen property with Raymond.

Shank's statements, but noted it was without prejudice and it would revisit the ruling if the defense gained additional information. The court also ruled on a motion to exclude statements from Huntington concerning Raymond's drug use (discussed *supra*). Granting a motion to exclude evidence is not a *Brady* violation.

Because the State did not withhold evidence from Donaghe, and a *Brady* violation did not occur, Donaghe's due process rights were not violated.

### 2. Denying Evidence of Drug Use

Donaghe claims the court abused its discretion when it did not allow Donaghe to present evidence of Raymond's drug use. This issue was already raised in the briefing; therefore, we will not address it again here.

### 3. Jury Instructions

For the first time on appeal, Donaghe contends jury instructions 15,[7] 18 and 23 were unlawful as written and reversal is required. While none of the instructions are unlawful as written, the court erroneously stated the law when reading instruction 23 to the jury before deliberation. But the instructions as a whole inform the jury of the applicable law and the error was not a manifest error affecting Donaghe's constitutional rights; therefore, reversal is not required.

Generally, we do not consider issues which were not raised in the trial court, but a "manifest error affecting a constitutional right" may be raised for the first time on appeal. RAP 2.5(a); *State v. McFarland*, 127 Wn.2d 322, 333, 899

---

[7] Donaghe's argument cites to jury instruction 5, but it is clear based on the language in his argument that he meant to refer to instruction 15.

P.2d 1251 (1995). An erroneous jury instruction rises to the level of manifest constitutional error when it "violat[es] an explicit constitutional provision or den[ies] the defendant a fair trial through a complete verdict." *State v. O'Hara*, 167 Wn.2d 91, 103, 217 P.3d 756 (2009). Whether an erroneous self-defense jury instruction rises to the level of "manifest error affecting a constitutional right," is a case-specific determination. *O'Hara*, 167 Wn.2d at 100.

We review challenged jury instructions de novo. *Harris*, 164 Wn. App. at 383. Each instruction must be examined in the context of the instructions as a whole. *Sublett*, 176 Wn.2d at 78.

Jury instructions are sufficient if they permit the defendant to "argue their theory of the case, are not misleading, and, when read as a whole, properly inform the trier of fact of the applicable law." *Harris*, 164 Wn. App. at 383. Juries are assumed to follow the directions provided by the court. *State v. Ford*, 117 Wn.2d 185, 192, 250 P.3d 97 (2011). "We presume [jurors] 'read [instructions] as a whole' to discern the 'relevant legal standard.' " *State v. Weaver*, 198 Wn.2d 459, 467, 496 P.3d 1183 (2021) (last alteration in original) (quoting *State v. LeFaber*, 128 Wn.2d 896, 900, 913 P.2d 369 (1996)).

An erroneous jury instruction that relieves the State of its burden is reversible error, unless the error is harmless beyond a reasonable doubt. *State v. Walden*, 131 Wn.2d 469, 478, 932 P.2d 1237 (1997). An error is harmless beyond a reasonable doubt if " 'the jury verdict would have been the same absent the error.' " *State v. Brown*, 147 Wn.2d 330, 341, 58 P.3d 889 (2002) (quoting *Neder v. United States*, 527 U.S. 1, 19, 119 S. Ct. 1827, 144 L. Ed. 2d

35 (1999)).  A misleading instruction does not require reversal unless the defendant can show prejudice.  *State v. Lundy*, 162 Wn. App. 865, 872, 256 P.3d 466 (2011).

### a.  Instructions 15 and 18—Assault

Donaghe claims the jury instructions concerning murder in the second degree with second degree assault as the predicate felony (instruction 15) and assault (instruction 18) were erroneous because assault cannot serve as the predicate crime for felony murder.  We disagree.

Donaghe contends jury instructions 15 and 18 were erroneous because they "used first degree assault as a description to convict."  Donaghe relies on *In re Personal Restraint of Andress*, 147 Wn.2d 602, 56 P.3d 981 (2002), in claiming assault cannot serve as the predicate felony for felony murder.  But in the wake of *Andress*, the legislature amended the felony murder statute to explicitly include assault.[8]  Accordingly, the jury instructions including assault as the predicate crime were not erroneous.

### b.  Instruction 23—Act on Appearances

Donaghe contends jury instruction 23 was unlawful as written and misstated the law.[9]  Donaghe is correct that the court orally misstated the law with regard to when a person is entitled to act on appearances in defending

---

[8]  *See* RCW 9A.32.050.

[9]  While Donaghe says the instruction was unlawful as written, he cites to the report of proceedings, where the court read the instructions to the jury.

themselves.[10]  The correct instruction, which was provided to the jury in their written instructions[11] specified, "A person *is* entitled to act on appearances," but when the court read the instruction out loud to the jury, it stated the law as, "A person *is not* entitled to act on appearances."  (Emphasis added.)  While the trial court clearly misspoke, the error is not a manifest constitutional error.

A similar error in jury instructions arose in *State v. McLoyd*, 87 Wn. App. 66, 939 P.2d 1255 (1997).  McLoyd was charged with second degree murder based on an underlying felony of second degree assault.  *Id.* at 68.  This court gave the jury instructions on justifiable homicide (WPIC 16.2) and "act on appearances" (WPIC 16.7).  *Id.* at 68-69.  When the court read the justifiable homicide instruction, it misstated the law, providing, "Homicide is justifiable when committed in the lawful defense of the slayer when . . . there was imminent danger of such harm being accomplished."  *Id.* at 68.  The correct standard is whether the defendant reasonably believed harm was imminent, not whether, in fact, imminent harm occurred.  *Id.* at 69.  But the jury instruction for "act on appearances" correctly stated, "Actual danger is not necessary for a homicide to be justifiable."  *Id.* at 69.

McLoyd argued the instructions were ambiguous because the jury was given conflicting laws on self-defense and the court could not determine which directions the jury followed.  *Id.* at 69.  This court disagreed and concluded, when

_____

[10]  Because neither the State nor Donaghe's attorney addressed this issue in their original briefing, we allowed the parties to provide a written response after oral argument.

[11]  Each juror was provided with their own set of written instructions.

read as a whole, the directions properly informed the jury of the applicable law. *Id.* at 71-72. The court noted that WPIC 16.7 "explicitly informed the jury that a person was entitled to act on appearances and that actual danger was not necessary." *Id.* at 71.

Here, similar to *McLoyd*, when read as a whole, the instructions properly informed the jury of the law. While instruction 23 was ambiguous as read to the jury,[12] the instructions as a whole made it clear Donaghe only needed to "reasonably believe" imminent danger existed. All other instructions confirmed the standard was what Donaghe reasonably believed in light of all the facts and circumstances known at the time, not that actual danger was necessary.

Additionally, the written instructions were correct, and the jury is presumed to read the instructions. Each juror was given their own set of instructions with the correct WPIC for "act on appearances," and the court directed jurors to "consider the instructions as a whole" during deliberations. Assuming the jurors read their instructions as they were advised, they would have been informed of the correct law. Not only did the jurors have the correct instructions in writing, but both the State and Donaghe clarified the correct law in closing arguments. During Donaghe's closing argument, counsel reiterated:

> I just want to turn your attention to the instructions. There's two instructions about justifiable homicide, one is for first degree murder and one is for second-degree murder. And here the State puts a lot of emphasis on a reasonably prudent person as if [sic]

---

[12] As read to the jury, the instruction included both the incorrect standard ("A person is not entitled to act on appearances . . .") and later, the correct standard ("Actual danger is not necessary . . . "). As such, the instruction was not wholly erroneous, but it was contradictory.

were the standard. But, actually, in Instruction Number 11, it says, "A person is entitled to act on appearances in defending himself if that person believes in good faith and on reasonable grounds that he is in actual danger of great personal injury although it afterwards might develop that the person was mistaken as to the extent of the danger. Actual danger is not necessary for a homicide to be justifiable.[13]

When read as a whole, the jury instructions informed the jury of the correct law and the instructions allowed Donaghe to argue his theory of the case. Accordingly, the instructions were not prejudicial, the trial court's error was not a manifest error affecting Donaghe's constitutional rights, and reversal is not warranted.

Because assault can serve as the predicate crime for felony murder, and the instructions as a whole informed the jury of the correct law, the jury instructions were not unconstitutional.

We affirm the conviction, but remand the case to correct the scrivener's error.

_____

WE CONCUR:

_____    _____

---

[13] While instruction 11 came directly after the instruction for first degree murder in the instructions, it was the same instruction as the "act on appearances" instruction for second degree murder (instruction 23), which Donaghe alluded to in closing arguments.